**In re Bruce SELCRAIG, Appellant.**

No. 82–1067.

United States Court of Appeals, Fifth Circuit.

May 27, 1983.

Thomas S. Leatherbury, Charles L. Babcock, Dallas, Tex., for appellant.

John J. Watkins, School of Law, Baylor University, Waco, Tex., for amicus curiae Soc. of Professional Journalists, etc.

Frank M. Gilstrap, Arlington, Tex., for Dr. Paul Trautman.

J. Carlisle DeHay, Jr., David W. Townend, John T. Sears, Dallas, Tex., for all defendants.

Before WISDOM, RUBIN and TATE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A discharged school official, seeking to recover compensatory and punitive damages from a school district and two of its officers for publicizing false and stigmatizing charges against him, contends that the

two officers disseminated the defamatory charges by secretly imparting them to a newspaper reporter and that, as a result, the reporter made open inquiries that resulted in publication of the charges. The discharged official contends that he was denied due process by the failure of the school district to afford him a hearing on the charges and a chance to prove his innocence. After proceedings to assure that whether the school district's officers were the source of the reporter's information was central to the claim; that circumstantial evidence pointed to a school district officer or employee as the communicant; and that alternative ways of confirming that hypothesis had been exhausted, the district court ordered that the journalist testify *in camera* and there respond to narrowly limited questions directed only to ascertaining whether a school district officer was the source of his information. Upon his refusal to do so, the court cited the reporter for civil contempt. The reporter appeals, invoking the journalist's qualified privilege under the first amendment not to reveal his confidential sources. Despite the care taken by the district court, we find that the necessity of obtaining the information was not yet established and the reporter's qualified privilege, therefore, not yet overcome. We, therefore, vacate the contempt decree.

I.

▮ We have recognized that the first amendment shields a reporter from being required to disclose the identity of persons who have imparted information to him in confidence. *Miller v. Transamerican Press,* 621 F.2d 721 (5th Cir.), *modified on rehearing,* 628 F.2d 932 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). Our course was dictated by our careful reading of the plurality and concurring opinions in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The privilege, we held, is not absolute, but qualified. In libel cases, it can be overcome, but only if the party who seeks disclosure of the identity of a confidential informant establishes by substantial evidence that the statement attributed to the informant was published and is both factually untrue and defamatory; that reasonable efforts have been made to learn the identity of the reporter's informant by alternative means; that no other reasonable means is available; and that knowledge of the identity of the informant is necessary to proper preparation and presentation of the case. *Miller,* 628 F.2d at 932. Determining the relevance of the confidential informant's identity and the need for its disclosure in this § 1983 action requires us to review the parties' allegations and the information developed in discovery proceedings. No trial having yet been held and no summary judgment on these issues having yet been granted, the accuracy of these factual allegations is untested.

Dr. Paul Trautman, a professional school administrator, was employed by the Dallas Independent School District (DISD) under a one-year contract. During the year, he was appointed Acting Assistant Superintendent for Support Services to replace an employee suspended for alleged misuse of funds. Soon after his appointment, a DISD custodial employee, Anita Horton, reported derogatory information about Trautman.

Bruce Selcraig, then education reporter for the *Dallas Morning News* (the *News*), somehow learned of Horton's report. He interviewed DISD Superintendent Linus Wright and another DISD officer, Robby Collins, in Wright's office. These officers confirmed some of the information about which Selcraig inquired. Selcraig also telephoned Trautman to get Trautman's reactions to the allegations. Trautman testified in a deposition that he first learned of the charges against him from Selcraig's phone call, and then categorically denied them. He also testified that, in this conversation, he asked where Selcraig had gotten his information, and that Selcraig said it came from "two high-placed administrators."

On October 4, 1979, the *News* published an article by Selcraig giving a detailed account of the allegations about Trautman and quoting his denial. The article reported that DISD had forwarded an affidavit

executed by Horton to the local district attorney. It also stated that Superintendent Wright had asked Trautman to take a polygraph test, that Trautman had not yet responded to the request, that Wright declined to comment on the specifics of the investigation, and that Collins declined to comment on the case. In addition to relying on the Horton affidavit and interviews with Trautman, Wright, Collins, and others the article attributed information to "sources close to the investigation" and to "individuals familiar with the district's internal investigations." That afternoon the *Dallas Times Herald* (the *Herald*) published an article on the Trautman story. As the controversy continued, the allegations against Trautman reappeared in news articles that reported attributed statements of DISD officials.

On October 6, 1979, Superintendent Wright placed Trautman on administrative leave with pay until the investigation of his activity was completed. Three months later Trautman still had not been restored to duty. On January 11, 1980, Trautman wrote to Wright, offering to resign when his contract ended on August 31, 1980. Wright responded with a letter stating that he was recommending Trautman's immediate termination and advising Trautman of his right to appeal termination. On January 24, 1980, Trautman made written demand on DISD for a due process hearing so that he would have a chance to clear his name. He contends that he was informed a hearing would be accorded him, but none was scheduled. In June another DISD official, John Santillo, solicited a resolution of the matter. Santillo and Trautman agreed that DISD would provide Trautman with letters of recommendation and acknowledgments of his good character and capable performance of his duties. In return, Trautman would waive the anticipated due process hearing and would resign.

Trautman resigned effective July 1, two months before the end of his contract term, withdrawing his demand for a hearing. He now contends that his resignation was procured by fraud: DISD did not intend to keep its deal, and never did. Seeking to set aside his resignation and to obtain damages, he sues DISD; the members of its Board of Trustees in their official capacities; and Wright and Santillo in both their individual and official capacities. Trautman's complaint alleges that the defendants deprived him of substantive due process by invading his constitutionally protected liberty interest when they "caused to be made public in an official and/or intentional way, false and stigmatizing allegations against him." This, he contends, was arbitrary and capricious state action. He also contends that he was deprived of his liberty interest by the failure and refusal of the defendants to provide him with a due process hearing "prior or subsequent to such deprivation" and by the defendants' fraudulent inducement of his resignation. Last, he contends that, in violation of his agreement with Santillo, Wright and Santillo publicly disseminated additional stigmatizing allegations against him after his resignation without affording him a name-clearing hearing. He admits, however, that he did not request any such hearing after he resigned.

While Trautman alleges that his constitutionally protected property rights were also invaded by these actions, he does not contend that Selcraig's testimony is relevant to his property-deprivation claims. We focus, therefore, only on the claims based on damage to his liberty interest, that is his reputation, by the stigmatizing charges made without granting him a name-clearing hearing. As we have noted, these are two-fold: denial of substantive due process by arbitrary action and denial of procedural due process by failure to hold a hearing. Trautman contends that identification of Selcraig's sources [1] is essential because he has a

---

1. Trautman alleges that, in the telephone conversation he had with Selcraig before the October 4 article was published, Selcraig stated that he got his information from "two high-placed administrators." Trautman interprets this to mean that Selcraig has two confidential sources who are DISD administrators. Selcraig refuses to confirm or deny this theory. For convenience in reporting Trautman's

right to exemplary or punitive damages if the publication was malicious[2] and the making of a clandestine communication to Selcraig would demonstrate such an intent.

During discovery, Trautman subpoenaed five reporters whose bylines had appeared on articles concerning him published in the *News* and the *Herald*. The subpoenas directed the reporters to appear for depositions and to produce all notes on which they relied in writing articles about Trautman. Selcraig was among the reporters subpoenaed. At his deposition, Selcraig confirmed that, in an interview with Wright and Collins, these two made statements to him on which he based, at least in part, the *News* article that broke the story about Trautman. Selcraig declined, however, to identify the confidential sources who had given him the initial information about Horton's report and the other information that launched his open inquiries to Wright and Collins. He claimed the qualified reporter's privilege recognized in *Miller*.

Trautman took depositions from Wright and Collins, each of whom denied giving Selcraig information before the interview in Wright's office. Trautman also submitted interrogatories to DISD, seeking to learn Selcraig's source. DISD responded that it had sent twenty-three questionnaires "to the [DISD] executive team" and twenty-three replies had been received. "The re-

sults of the investigation did not disclose the identity of anyone who furnished the [Horton] affidavit to Mr. Selcraig." Pursuant to the court's instructions, the DISD trustees held two closed meetings with Wright and DISD's lawyers. The trustees and Wright "confirmed that they [did] not know who furnished the Horton affidavit" to Selcraig.

Trautman then filed a motion to compel Selcraig to reveal these sources. In support of his motion, he averred that, if Selcraig's confidential sources held managerial positions in DISD, their identities would support his claim that DISD had itself published the charges against him. Furthermore, if the confidential sources had been Selcraig's original sources of information, their initial dissemination of the charges would provide the evidence of malice Trautman needed to recover punitive damages.

The district court postponed ruling on Trautman's motion until after a hearing on the nature and legal validity of Trautman's claims and on the relevance of the information Trautman sought from Selcraig. The court requested the parties to address four issues at the hearing. The first two issues would clarify whether Trautman stated a sufficient claim for relief.[3] The second two issues would show the need for Selcraig's testimony.[4] After the hearing, the district

---

claims, we refer to Selcraig's confidential source(s) in the plural.

2. *See Smith v. Wade,* ── U.S. ──, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (jury may assess punitive damages in § 1983 action when defendant's conduct motivated by evil motive or intent).

3. The first set of issues was:
 (1) Whether, after *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), a public employee has a constitutional right to be free of false, stigmatizing charges by state officials which damage his reputation *irrespective of* any loss, or alteration of, his *current* employment rights; that is, whether the dissemination of false, stigmatizing charges in advance of a due process hearing, alone, or in conjunction with probable detriment to *future* employment opportunities, is sufficient to state a claim under 42 U.S.C. § 1983.

(2) Whether, by entering into a settlement agreement, Dr. Trautman waived his right, if any, to complain of the alleged denial of procedural due process in connection with (a) the alleged dissemination of false, stigmatizing charges or (b) Defendants' alleged alteration of Plaintiff's employment contract with the DISD.

4. The second set was:
 (3) Do discovery materials on file, or to be filed, indicate that Defendants, or other DISD employees, furnished Mr. Selcraig the allegedly false and stigmatizing information reported in his October 4, 1980 [sic] article, and, if so, what purposes will be served by compelling disclosure of the identity of Selcraig's "sources"?
 (4) Has Plaintiff exhausted all reasonable alternative means to ascertain the identity of Selcraig's sources?
 Although the phrasing of the last issue suggests an improper focus on who Selcraig's

judge found that Trautman had exhausted all reasonable alternative means of learning whether Selcraig's confidential sources had been DISD officials and that circumstantial evidence "sufficiently raised the probability that the school district was [Selcraig's] source as to justify an *in camera* proceeding," to be held without counsel present.

The court set out an order of inquiry for the *in camera* hearing that would protect Selcraig's qualified first amendment privilege as far as possible. The court would first ask Selcraig whether his confidential sources occupied such positions that their publication of the charges against Trautman could be attributed to DISD. If Selcraig answered that the sources were not connected with DISD, the inquiry would stop there. If the sources had some connection with DISD, Selcraig would have to name their positions more precisely. For example, if the sources were DISD secretaries, their revelations to Selcraig would not be attributable to the school district. The court would proceed to the second stage of the inquiry only if necessary. At this stage, Selcraig would be asked to divulge the identity of the sources and, if needed, the information they imparted to him. Only if the inquiry reached the second stage would the court reveal anything to counsel. The court would decide how much was to be disclosed. Any revelations to counsel would be under a protective order to insure confidentiality so far as possible. It is thus apparent that the court proceeded in a deliberate manner before ordering any disclosure and that it protected the privilege by requiring disclosure only *in camera* and by proposing a sequence of questions that would prevent disclosure of the identity of the confidential informants until their connection with DISD and Trautman's need to know their identities was established.

Selcraig attended the *in camera* hearing with counsel, but he refused to testify in accordance with the court's order. The district court, therefore, held Selcraig in con-

tempt of court and ordered his imprisonment until he testified or otherwise purged himself of the civil contempt. This order was stayed pending appeal.

Selcraig first urged that the contempt proceedings be stayed because Trautman's action might be dismissed on motion for summary judgment. However, after we heard oral argument in this appeal, the district judge, acting on remand for the purpose of considering the motions for summary judgment proffered by the defendants, denied them. He reasoned that whether Trautman had waived his right to a post-termination administrative hearing was a disputed question of fact. He also deemed it inappropriate to grant summary judgment against Trautman before his right to discover Selcraig's testimony had been determined.

## II.

■ The due process clause protects against arbitrary deprivation of both property and liberty interests. However, official publication of a stigmatizing charge against an employee, without discharge, is not of itself constitutionally prohibited, for, "The words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law." *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405, 413 (1976). "[R]eputation alone, apart from some more tangible interests such as employment, is [not] 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701, 96 S.Ct. at 1161, 47 L.Ed.2d at 413. Damage to reputation alone, unaccompanied by other injury, will not, therefore, suffice for recovery under 42 U.S.C. § 1983, which protects only against "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

---

sources were rather than whether they were DISD officials, the district judge, in later pro-

ceedings, made clear that he was concerned only with whether DISD was implicated.

A constitutional deprivation of liberty occurs when there is some injury to employment or employment opportunities in addition to damage to reputation and a subsequent denial of procedural due process [5] to redress that injury. *Compare Huntley v. Community School Board,* 543 F.2d 979 (2d Cir.1976), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977) (termination of untenured school principal in course of announcing charges of incompetence impaired his *property* interest in future *government* employment).[6] "[T]he remedy mandated by the Due Process Clause of the Fourteenth Amendment is 'an opportunity to refute the [stigmatizing] charge.'" *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 624, 626–627, 51 L.Ed.2d 92, 95–96 (1977).[7] If the charges were true, a hearing would not redress the stigmatization, for it would only demonstrate their verity. "No hearing would [in that case] afford a promise" of providing a person about whom derogatory information had been published with "an opportunity to clear his name." *Codd v. Velger,* 429 U.S. at 627, 97 S.Ct. at 884, 51 L.Ed.2d at 96. The hearing, then, is not a prerequisite to publication and the state is not obliged to tender one.[8] The state need only make known to the stigmatized employee that he may have an opportunity to clear his name upon request. It need not initiate the hearing process of its own accord.

Trautman contends that the act of publishing the information about him constitutes a denial of substantive due process. *Paul v. Davis* and *Codd v. Velger* both necessarily imply that the fourteenth amendment provides only procedural protection against injury inflicted by state officers to the interest state employees have in their reputation. *See also Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515, 519 (1971) (where government action injured reputation, notice and opportunity to be heard prescribed); *White v. Thomas,* 660 F.2d 680, 685 (5th Cir.1981) (plaintiff to be afforded only opportunity to refute charge). It follows from these authorities and what we have already said that reputation per se is not a property interest protected against state infringement; what is protected is the maligned employee's right to a procedure that will afford him a chance to refute unfounded charges,[9] and that Trautman

---

**5.** *Paul v. Davis. See also Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 341 (5th Cir.1978).

**6.** To prove deprivation of such a liberty interest, a public employee must show that his employer "has made or is likely to make the allegedly stigmatizing charges public 'in any official or intentional manner.'" *Ortwein v. Mackey,* 511 F.2d 696, 699 (5th Cir.1975), *quoting Kaprelian v. Texas Woman's University,* 509 F.2d 133, 139 (5th Cir.1975).

**7.** *Accord Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 558 (1972) (due process requires that the employee have an opportunity of refutation if the state, in discharging or failing to rehire him, makes a "charge against him that might seriously damage his standing and associations in the community" or that imposes "a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities"); *Patterson v. Ramsey,* 552 F.2d 117, 118 (4th Cir.1977) (per curiam); *Austin v. Board of Education,* 562 F.2d 446, 449–51 (7th Cir.1977).

**8.** *See Perry v. Sinderman,* 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570, 580 (1972) (if Sinderman proved property interest in continued employment, he would be entitled to a hearing on request).

**9.** Procedural due process was the right protected not only in *Wisconsin v. Constantineau,* but also in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (termination of public assistance payments); *Bell v. Burson* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (revocation of driver's license); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (revocation of probation); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (revocation of prisoner's good time credit); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (nonrenewal of college teacher's contract); *see also Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (no right to hearing before termination of a nontenured college teacher's employment because he had no property interest in employment and the decision effected no constitutionally significant change to his reputation).

cannot successfully assert a substantive due process claim.

 Trautman may establish his § 1983 claim for denial of procedural due process by showing DISD's publication of the charges, the injury to his employment, and the denial of a name-clearing hearing. Publication is shown by the official interviews with the press. It is not necessary to proof of his claim that he establish also a prior secret disclosure to Selcraig.[10] Whether such an earlier dissemination occurred is material only to the recovery of punitive or exemplary damages. While Trautman has no right to punitive damages against DISD,[11] if he can establish all the other elements of his claim, he has, indeed, a right to such damages against the individual defendants if he can show that they made the charges maliciously. *Smith v. Wade,* —— U.S. ——, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

 At this stage, the record does not establish even prima facie, by affidavit or deposition, the elements of a claim for liability. It has not been shown that DISD deprived Trautman of his right to a hearing.[12] Unless he can set aside the waiver contained in his resignation, he cannot establish that he was denied a hearing, and thus he cannot establish the defendants' liability under 42 U.S.C. § 1983. And, of course, he cannot recover punitive damages against the individual defendants until their primary liability is established. Because Selcraig's testimony is necessary only to determine Trautman's punitive damages claim, it is evident that Trautman has not

yet shown the necessity for it. In short, he has not yet overcome Selcraig's qualified privilege not to reveal confidential news sources. We do not intimate that in every case necessity must be demonstrated by marshalling evidentiary material, by successfully resisting motions for summary judgment, or by other protracted preliminary proceedings. The method of establishing necessity for the confidential information depends on the circumstances of the case in which it is sought, including the issue to which the information is relevant.

Trautman admits that he has not requested a hearing since his resignation, nor has he formally asked that his resignation be withdrawn. Thus, he has not shown any factual basis for his charge that he has been denied a hearing at any time. He contends that it is unnecessary for him formally to set aside his resignation because the defendants fraudulently induced it and thereafter refused to honor the promises by which they procured it. Once the defendants' fraud was exposed, Trautman continues, his position automatically reverted to the *status quo ante, i.e.,* before his resignation was tendered. The defendants counter that Trautman, by failing to renew his request for a hearing after his resignation and by failing formally to rescind his resignation, "intentionally and voluntarily" waived his right to a hearing. They sought summary judgment on this theory, but the district court declined to rule on the issue, reasoning that "[w]aiver of constitutional rights is not to be lightly inferred" and "that a jury question is presented." We agree that whether the resignation was

---

**10.** Trautman argues that he has a right to recover independently for each dissemination, but this argument is premised on the erroneous theory, discussed in the preceding paragraph, that the dissemination itself is a constitutional deprivation. However many times DISD repeated the charges, Trautman's right to recover arises from the denial of a hearing to refute the charges. The extent of publication would be relevant only to the amount of damages suffered. In view of the wide publicity given to the charges by the newspaper articles, Trautman could not have suffered additional damage by a covert disclosure to Selcraig.

**11.** Only individual defendants are liable for exemplary damages. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Webster v. City of Houston,* 689 F.2d 1220, 1228–29 (5th Cir.1982).

**12.** We express no opinion concerning whether this claim, standing alone, would confer federal jurisdiction because it must begin with an effort to set aside the resignation. Until that is accomplished, the right to the due process hearing is not established. Of course, the court might have jurisdiction of this claim as a state cause of action pendent to the other federal claims asserted by Trautman.

fraudulently induced presents a question of fact. But the existence of this fact question demonstrates that, at this stage, the necessity of Selcraig's testimony has not been shown. Trautman should be required at least to demonstrate by affidavits or depositions, and not by mere allegation, a prima facie case of his right to set the waiver aside and thus to reach the true federal constitutional issue, whether he has been denied due process.

In order to determine whether there is a need for Selcraig's testimony, the record should also be clarified concerning whether Trautman seeks a "delayed *Roth* hearing . . . at which he would have the opportunity to refute the charge in question," or whether he seeks only the "damages resulting from the [previous] denial of such [a] hearing." *Codd v. Velger,* 429 U.S. at 627 n. 1, 97 S.Ct. at 883 n. 1, 51 L.Ed.2d at 96 n. 1.[13] If he now seeks a delayed hearing, it is at least possible that DISD would grant such a hearing without prejudice to its defenses. In that event, the question of the truth or falsity of the charges against Trautman might be resolved. Even if their falsity is shown, the permanent stigmatizing effect and the consequent damage to Trautman would be affected.

 If, but only if, Trautman has been denied a hearing to which he has a facial entitlement would it be necessary for him to know the source of the information that guided Selcraig to elicit public comment on the charges from DISD officials. Until Trautman establishes that he has been refused a hearing, he may not compel Selcraig's testimony. This does not imply that, without Selcraig's testimony, Trautman has no procedural due process claim against the defendants for damaging his reputation. The charges publicly made to the press, coupled with his discharge and the denial of an opportunity thereafter to clear his name, suffice to state a claim for which relief may

be granted. The reply to press inquiry by DISD officials was not per se improper, even if it led to the publication of derogatory information. Public officials are not obliged to stonewall. They act properly when they respond to public inquiry. If, however, they do respond, they are obliged thereafter to afford procedural due process to the person charged.

 In order to facilitate proceedings on remand, we discuss other issues raised by the parties. As we have pointed out, it will be necessary to know the identity of Selcraig's informants only to establish the right to punitive damages. Selcraig argues that, therefore, the trial should be divided into stages and he should be compelled to answer the questions put to him only if Trautman establishes liability. We do not think it appropriate to require that the trial procedure be altered, simply to protect the reporter's privilege. Bifurcating the trial would either require the damage case to be presented without adequate pretrial discovery, or else would require a delay between the two trial stages. Noting the limited scope of the court's questions to Selcraig, we do not condition its right to compel answers on severance of trial issues, if Trautman can satisfy the court that he has a prima facie case for setting aside his resignation and waiver and that he has been refused a post-stigmatization administrative hearing.

 Selcraig also contends that his qualified privilege ought to be upheld and disclosure ought not be required, even if Trautman establishes the predicate for his testimony, because his position differs from that of reporters in other situations. In this case, he suggests, he is simply a witness trying to protect his sources, not a party invoking the qualified privilege to protect himself or his publication against a libel suit.[14] But the fact that he is a witness to a

---

**13.** *See Love v. Sessions,* 568 F.2d 357, 360 n. 6 (5th Cir.1978) (per curiam) (seeking damages) and *McKnight v. Southeastern Pennsylvania Transportation Authority,* 583 F.2d 1229 (3d Cir.1978) (same).

**14.** A test similar to that formulated by us in *Miller* has been applied in such cases. *E.g., Garland v. Torre,* 259 F.2d 545 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958).

material fact at issue makes the *Miller* test we formulated for use in libel suits, when generalized from its preoccupation with libel claims, a sufficient measure of the strength of his privilege. He is not being asked to divulge his sources to locate other witnesses or to get on the scent of evidence. He is a percipient witness to a fact at issue: the identity of the informants.[15] Manifestly, then, his testimony is relevant and necessary to the resolution of Trautman's claim for punitive damages. The district court found that Trautman has shown the probability that school district officers were Selcraig's informants and that Trautman has exhausted alternative means of establishing that fact. We accept these findings as not clearly erroneous. Fed.R.Civ.P. 52(a). In these circumstances, if Trautman can satisfy the district court that he can make out a prima facie case that he has not waived the right to, and has not been afforded, a hearing, Selcraig's qualified privilege must succumb to Trautman's discovery needs. If Selcraig is called to testify in further proceedings, the district court's carefully structured request for information might well serve as a model for any other inquiries.

We have not overlooked the contention made by Selcraig and by the amicus curiae that the *Miller* test is not strict enough to protect the reporter's privilege in civil cases when the reporter is a non-party witness and that the reporter's privilege is invadable only if it is shown that there is a "compelling need" for the information or that it is "absolutely critical" to a claim or defense. *Miller* establishes the rule for this circuit. We deem its criterion an adequate shield.

For these reasons, the order of civil contempt is VACATED.

---

**15.** *Compare In re Ziegler,* 9 Med.L.Rep. 1013 (W.D.N.Y.1982) (journalist who witnessed and reported on assault not excused from testifying before grand jury as to what he observed); *State v. Knorr,* 8 Med.L.Rep. 2067 (Or.Cir.Ct. 1982); *Rosato v. Superior Court,* 51 Cal.App.3d 190, 218, 124 Cal.Rptr. 427, 446 (1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976) (Supreme Court has denied that first amendment shields newsmen from testifying about criminal activity they observed); *People v. Dan,* 41 App.Div.2d 687, 342 N.Y.S.2d 731, *appeal dismissed,* 32 N.Y.2d 764, 344 N.Y. S.2d 955, 298 N.E.2d 118 (1973) (newsmen may refuse to divulge to grand jury identity of informant, but they must testify about events they observed personally, including identity of people they observed); *Lightman v. State,* 15 Md. App. 713, 294 A.2d 149, 156–57, *aff'd per curiam,* 266 Md. 550, 295 A.2d 212 (1972), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1922, 36 L.Ed.2d 414 (1973) (when newsman observes criminal activity, he, not the people observed, is the source of information, and he can be directed to disclose identity of people observed); *State v. Knops,* 49 Wis.2d 647, 183 N.W.2d 93 (1971) (privilege not to reveal confidential sources must yield to public's need to know those sources whom reporter has intimated were responsible for bombing university building); *Branzburg v. Pound,* 461 S.W.2d 345 (Ky.App. 1970), *aff'd sub nom. Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (reporter's privilege under state law not to reveal source of published information does not protect reporter from testifying about events he observes personally, including identity of people observed); *see generally* Goodale, Branzburg v. Hayes and the Developing Qualified Privilege for Newsmen, 26 Hastings L.J. 709 (1975).