**Weldon WELLS, Plaintiff,**

v.

**DALLAS INDEPENDENT SCHOOL DISTRICT, et al., Defendants.**

**Civ. A. No. CA3–79–1401–G.**

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 14, 1983.

Frank Hill, Arlington, Tex., for plaintiff.

Chas. Yuill, Jr., Dallas, Tex., for Medrano.

David W. Townend and J. Carlisle De-Hay, Jr., Dallas, Tex., for all remaining defendants.

## MEMORANDUM ORDER

FISH, District Judge.

### I. *The Background of This Case*

This civil rights action is before the court on defendants' motion for summary judgment and plaintiff's motion reurging partial summary judgment.[1] The case arose out of media allegations in 1978 and 1979 of fraud and mismanagement which rocked the Dallas Independent School District to its core.[2] The plaintiff, Weldon Wells, had been Assistant Superintendent of Support Services for the school district, in charge of the areas involved, during the entire period irregularities were occurring.

On December 5, 1978, Linus Wright replaced Nolan Estes as Superintendent of Schools. The "new broom" expected to sweep clean,[3] Wright initiated investigations which confirmed many of the rumors of shoddy repair and construction work, excessive charges paid to contractors for equipment rental and workman's compensation, "sweetheart deals" between the head of the DISD's heating and air conditioning department and a company in which

---

1. Judge Higginbotham, formerly of this court, had ordered plaintiff's motion be carried to trial.

2. As a result, five DISD employees were discharged, several were indicted by a grand jury, and some of those were sentenced to prison after pleading guilty. Although Wells was indicted, he was eventually cleared of criminal wrongdoing after the School District terminated his employment.

3. Wright was particularly suited to the task at hand because he had supervised the support services department of the Houston Independent School District for the three years during which Houston's "fast track" project was implemented.

the department head had a financial interest, violation of Texas open bidding laws, open purchase order abuse, and an illegal arrangement made during the previous administration between the DISD and the Foundation for Quality Education.[4] Some of the irregularities stemmed from the haste, pursuant to court-ordered desegregation, to complete construction of five "fast track" projects by the Maxwell Construction Company.[5] Others, however, were unrelated to those time pressures.

As a result of these investigations, Wright ordered his staff and Wells to eliminate certain practices and to implement new ones. Several months later, Wright became dissatisfied with Wells' job performance. The magnitude of the problems in the Support Services area convinced Wright to suspend Wells with pay on July 30, 1979 and ultimately to discharge him on September 14, 1979.[6] As reasons for terminating Wells' employment prior to expiration of Wells' current five-year contract,[7] Wright's letter of termination cited "mismanagement and inefficiency in the operation of your department/areas of responsibility, and failure to follow prescribed Board and Administrative Policies and Procedures." The letter also informed Wells of his right to appeal Wright's decision.

In an emergency meeting on September 14, 1979, in the presence of house counsel and their outside attorneys, the Board of Trustees of the school district unanimously sustained the decision of the Superintendent to terminate Wells' employment. At that time, the Board received general information on the results of the investigations from its attorneys and Wright. Wright did not, however, apprise the trustees of the detailed reasons for discharging Wells, for he warned them first that they would have to sit as an impartial panel in conducting a due process hearing at a later date and that secondly, public disclosure might impede ongoing investigations by other governmental agencies.

At the conclusion of the meeting, the Board of Trustees filed for record a resolution accepting the recommendation of the superintendent that the employment of Wells, Sentell, and Winger be terminated immediately. Brad Lapsley, Board President, filed the following statement of explanation:

> These actions are the result of continuing investigations into allegations of wrongdoing. It should be noted that some individuals and companies have been vindicated by the investigations. The contents of the full report will not be publicly released for several significant reasons:
>
> —Delicate personnel matters, including the right of due process for terminated employees are involved.
>
> —Possible matters of litigation, both civil and criminal, are involved.
>
> —Names of confidential informants are included.
>
> —Not all of the investigations are complete.
>
> It should be noted that the Board itself has not received full details of the investigation since it will have to conduct any appeals made by employees involved in these decisions.
>
> Appropriate information revealed through these investigations has been and will continue to be turned over to the District Attorney's Office for review.

---

4. The DISD had agreed that the Foundation would manage certain DISD properties, collecting and depositing the monies earned therefrom. James Bond, President of the Foundation, later pled guilty and was sentenced on related charges.

5. These included the Arts Magnet High School, City Park K–3, the Transportation Institute, the Business and Management Center, and the Health Magnet. The combined budget amounted to several millions of dollars.

6. On the same date, Wright terminated two professionals who reported to Wells: Gordon Sentell, the chief of architectural services, and Richard Winger, the supervisor of maintenance. He also terminated five persons categorized as "classified personnel."

7. Wells was first hired in 1958.

In response to Wright's termination letter, Wells sought a hearing, within a reasonable time, before an impartial panel with some academic expertise. After a delay of several weeks, during which Wells filed this suit, the DISD notified Wells of a date for hearing before an Administrative Council of the District and informed him of the eight specific charges against him:

1. Negligence and misconduct in the management and supervision of the activities and affairs of the department under his control.

2. Insubordination and disobedience in participating in the execution of a (second) management contract with the Foundation for Quality Education in direct opposition and defiance of orders of the General Superintendent.

3. Negligence and mismanagement by him in his agreement to terms and conditions and execution of documents relating to a pledge of retainage by Maxwell Construction Company to the Merchants State Bank.

4. Approval by him and persons under his direct supervision and control of payments for charges that he knew or should have known were unreasonable and excessive on various construction and repair jobs throughout the District.

5. Failure to ensure adequate job site supervision either by DISD staff or outside architects and engineers under contract to the DISD for such purposes.

6. Attempting by intimidation or other means to require principals and other persons at various schools and job sites to improperly and falsely approve work performed on facilities under their control and supervision.

7. Failing to maintain adequate procedural and other safeguards as to competitive bidding.

8. Abuse and misuse of the emergency contract procedures and open purchase order procedures of the District by him and those under his supervision and control.

After some scheduling difficulties,[8] Wells' hearing finally began before three DISD administrators on January 31, 1980. After the testimony had concluded on February 18, 1980, the Administrative Council unanimously sustained the recommendation of the Superintendent that Wells should be terminated as an employee of the DISD. Wells then requested a hearing de novo before the Board of Trustees, although he contended that the Board could not serve as an impartial tribunal.

The hearing before the Board of Trustees began on April 7, 1980. That hearing ended on May 27, 1980. Shortly after Wells' criminal indictment the Trustees unanimously re-affirmed the decision of the Superintendent to terminate Wells' employment with the DISD.

## II. The Contentions of the Parties

The parties interpret these facts as leading to diametrically opposite legal conclusions. The School District contends that it had good cause to discharge Wells and that post-termination procedures afforded Wells procedural due process, curing any deficiency which may have existed in pre-termination procedures. Wells, on the other hand, claims that the DISD, Superintendent Wright and the Board of Trustees[9] deprived him of both his property interest in continued employment and his liberty interest in his reputation by failing to afford him procedural due process either before or after his discharge on September 14, 1979.[10] Wells also asserts that he did not receive substantive due process. The DISD's reasons for terminating his employment were arbitrary and capricious, Wells

---

8. Of the seven DISD employees under Wells' supervision discharged in connection with the irregularities, five besides Wells had requested hearings.

9. Wright and the members of the Board of Trustees are sued both individually and in their official capacities.

10. Wells does not attack the notice given after his discharge, but claims that he never received a proper hearing because the Trustees could not sit as an impartial tribunal.

argues, because they were false and could not constitute good cause for discharge.

### III. *The Property Interest*

#### A. *Wells' Standing*

■ The Due Process Clause of the Fourteenth Amendment protects both property and liberty interests. A property interest arises from a legitimate claim of entitlement to continued employment. It can derive from a mutually explicit understanding, a statute, or an express contract. *See Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–700, 33 L.Ed.2d 570 (1972); *Conley v. Board of Trustees of Grenada County Hospital,* 707 F.2d 175, 179 (5th Cir.1983). Wells' formal contract had not yet expired when the school district discharged him.[11]

■ Furthermore, Article 4111.5 of the Professional Personnel Guide of the DISD in force at the time provided that the district could "for cause discharge any teacher[12] and terminate any Contract of Employment at any time during the term thereof...." Courts have recognized such provisions as creating property interests, even in the absence of a written contract such as that of Wells. *See Conley,* 707 F.2d at 179–81; *Glenn v. Newman,* 614 F.2d 467, 471 (5th Cir.1980); *Bueno v. City of Donna,* 714 F.2d 484, 492 (5th Cir.1983). By virtue of his contract as well as the provisions of the DISD guidebook,[13] Wells clearly had an express right to continued employment by the DISD constituting a protectable property interest.

#### B. *The Scope of Review*

■ The threshold question is whether the DISD violated due process in the course of discharging Wells, for if correct procedures were followed, the federal courts are not entitled to conduct a *de novo* review of the school board's actions.[14] The courts are then limited to determining whether the decision of the administrative body is supported by substantial evidence. *Ferguson v. Thomas,* 430 F.2d 852, 858 (5th Cir.1970). *Accord, White v. South Park Independent School District,* 693 F.2d 1163, 1165–66, n. 1 (5th Cir.1982). In fact, *de novo* hearings on such matters are not favored. *Viverette v. Lurleen B. Wallace State Jr. College,* 587 F.2d 191, 193 (5th Cir.1979). As aptly stated in *Ferguson, supra,* at 858,

> [F]ull development of the merits of a case of this type constitutes both an intrusion into the internal affairs of state educational institutions and an unwise burden on judicial administration of the courts. School constituted review bodies are the proper forums for thrashing out such matters.

While findings of a school review agency are not to be accorded the stature of findings of a district court, such findings, when reached by correct procedures and supported by substantial evidence, are entitled to great weight, and the court should never lightly substitute its judgment for that of the board. *See Ferguson* at 859.

#### C. *What Process is Due, and When?*

■ Notice and a hearing constitute the essence of that process due in terminating the employment of one with a property

---

**11.** Wright discharged Wells on September 14, 1979, although Wells' contract extended to August 31, 1982.

**12.** The DISD has consistently construed this provision as applying to administrators as well as teachers.

**13.** While a failure to follow internal dismissal procedures may not automatically create a cause of action for deprivation of due process, failure to provide minimal notice and a hearing does. *See Atencio v. Board of Education of Pensaco Independent School District,* 658 F.2d

774, 778–79 (10th Cir.1981). When published rules and regulations establish a particular statutory procedure for the termination of a teacher's employment, however, and they add to the constitutional minimum, then they must be followed. *See Ferguson v. Thomas,* 430 F.2d 852, 856 (5th Cir.1970).

**14.** If, on the other hand, a procedural deficit appears, the proper course for the district court is to remand the matter to the institution for its, albeit belated, compliance with minimum standards prior to further court adjudication. *Ferguson* at 858.

interest. The notice required is a written statement of the reasons for termination; these must be given prior to discharge. *Bueno* at 493; *Conley* at 182; *Thurston v. Dekle*, 531 F.2d 1264, 1273 (5th Cir.1976), vacated and remanded on other grounds, 438 U.S. 901 (1978). *See also Perry v. Sindermann*, 408 U.S. at 601, 92 S.Ct. at 2699. Although Superintendent Wright twice informed Wells in writing of the reasons for his discharge, neither the first nor the second notice was received by Wells in advance of his discharge. Wright's letter of September 14, 1979 notified Wells that his employment was being terminated effective immediately. It listed three general reasons for the discharge,[15] but it did not comply with the due process requirement of notice *prior to* termination.[16]

As to an opportunity for hearing, the second due process requirement for an employee with a protectable property interest, a long line of decisions has distinguished between the type of hearing required as a minimum prior to termination and that which may be delayed until discharge has occurred.[17] The requisites of the latter type of hearing were discussed by the Fifth Circuit in *Thurston v. Dekle, supra,* 531 F.2d 1264, 1273, where the court emphasized the necessity of procedures to minimize the risk of improper termination:

> Where a governmental employer chooses to postpone the opportunity of a non-probationary employee to secure a full-evidentiary hearing until after dismissal, risk reducing procedures must be accorded. These must include, prior to termination, written notice of the reasons for termination and an effective opportunity

to rebut those reasons. Effective rebuttal must give the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision.

*Accord, Bueno* at 493 and *Conley* at 182. This minimum was established to balance the interests of the government and the employee by reducing the risk to an employee of wrongful termination without burdening the government with elaborate pretermination proceedings.[18]

▪ The DISD failed to provide Wells with written notice of termination and an effective opportunity to rebut the reasons for termination before termination of Wells' employment became effective. The conclusion is therefore inescapable that the school district denied Wells pre-termination due process.

Anticipating the court's ruling in this regard, the defendants argue that failure to afford minimal pre-termination procedures is of no consequence because post-termination notices and hearings cured any due process deficit. They rely on the case of *Glenn v. Newman*, 614 F.2d 467 (5th Cir.1980).[19]

The plaintiff in *Glenn*, unlike Wells, apparently failed to seek damages for mental distress or damages to career and reputation as a result of pre-termination deprivation of due process, for *Glenn* does not discuss the issue of damages.[20] In a subsequent case, however, where the plaintiff did allege that he suffered mental anguish and harm to his reputation, the district

---

**15.** Mismanagement, inefficiency and failure to follow administrative policies and procedures constituted Wright's grounds.

**16.** *See Conley, supra,* 707 F.2d 175 (summary judgment affirmed as to two plaintiffs on ·the issue of non-notification of specific charges in advance of adverse employment action; remand as to the third for a determination whether a suspension rather than a discharge had triggered due process protection).

**17.** "When protected interests are implicated, the right to some kind of prior hearing is para-

mount." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564 at 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972).

**18.** "The government interest in efficient ... operation is a weighty one." *Thurston* at 1272.

**19.** In *Wilson v. Taylor,* 658 F.2d 1021 (5th Cir. 1981) the Fifth Circuit declined to follow a holding of *Glenn* which concerned back pay, but did not overrule that case in its entirety.

**20.** The panel denied declaratory and injunctive relief. *Glenn* at 473 n. 6.

court found that post-termination proceedings cured any constitutional infirmity, and awarded only nominal damages for the procedural due process violation. The Fifth Circuit vacated and remanded, however, explaining that "*Carey v. Piphus* [435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)] makes it clear that if a plaintiff can prove actual damages resulting solely from the deprivation of procedural due process, the plaintiff is entitled to damages." *Wilson v. Taylor*, 658 F.2d 1021, 1032 (5th Cir. 1981).[21] The district court was directed on remand to give plaintiff an opportunity to present evidence of mental anguish, damage to his career and personal reputation, and evidence supporting punitive damages.[22] *Wilson* at 1032–33.

 It is evident, therefore, that even if this court should determine that the Board of Trustees provided post-termination procedures which complied with procedural due process, the use of the word "cure" merely confuses the issue. Such a cure does not eradicate the initial violation, nor eliminate a right to any damages thereby incurred, although it does offer the discharged employee an opportunity to vindicate himself and the governmental body an opportunity to retract the decision to discharge.

 Accordingly, because the defendants denied Wells procedural due process prior to terminating his employment, Wells may present evidence of damages for mental distress and harm to career and personal reputation. Even where a public employee's discharge is subsequently determined to have been substantively justified, he may recover his actual damages flowing from a deprivation of pre-termination due process. *See Laje v. R.E. Thomason General Hospital*, 665 F.2d 724, 728 (5th Cir.1982). It should be noted, however, that

> ... if the emotional distress or any damage to Wilson's career and reputation

would have been incurred even if proper procedures had been used in discharging him—*i.e.*, if such injuries were caused not by the pretermination procedural violation, but rather were caused by the discharge itself ... then he would not be entitled to such damages.

*Wilson*, 658 F.2d at 1033.

In other words, Wells must identify for the finder of fact what damage to his career and reputation, as well as what mental and emotional distress, flowed from the pre-termination deprivation of procedural due process rather than from the discharge itself or his subsequent indictment. If Wells fails to prove any actual damages from this deprivation, he may nonetheless be entitled to nominal damages under *Carey*.

**D. *The Adequacy of Post-Termination Procedures***

Unless the post-termination procedures complied with the minimum requirements of due process, this court must remand the matter to the school district for belated compliance before further adjudication in federal court. *Ferguson v. Thomas*, 430 F.2d at 858.

 Plaintiff alleges that even after termination he never received an adequate hearing, for the Board of Trustees was prejudiced against him. The Constitution requires at a minimum that the party deprived of a property right have an opportunity for a hearing, granted at a meaningful time and in a meaningful manner, such a hearing to be appropriate to the nature of the case. *See Shawgo v. Spradlin*, 701 F.2d 470, 480 (5th Cir.1983), citing to *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). When an educator such as Wells opposes his termination for cause, the hearing he receives should be before a tribunal that possesses both some academic expertise and an apparent impartiality toward the charges. *Ferguson* at 856.

**21.** The panels in *Glenn* and *Wilson* had one member in common, Circuit Judge Hatchett.

**22.** These could be awarded in a § 1983 action even without actual loss, despite local law to the contrary. *Wilson* at 1033.

In asserting that prejudice infected the Board of Trustees in April and May of 1980 so that it was not an impartial tribunal, Wells ignores the extensive hearing conducted in January and February of 1980 before the Administrative Council, which consisted of three DISD administrators. Several months before that hearing, John Santillo, Assistant Superintendent for Personnel Services, furnished Wells and his attorneys with a specification of the charges.[23] Wells also received, in advance of the hearing, a list of witnesses and their expected testimony. At the hearing Wells' attorneys had the opportunity to present evidence and to cross-examine. A court reporter attended the hearings, and a copy of the more than 1500-page transcript was furnished to Wells. Two and a half weeks after the hearing had begun, the Administrative Council unanimously sustained Wright's determination that Wells' employment should be terminated.

 Wells has made no showing that the Administrative Council was an inadequate tribunal, nor has he attacked the manner in which the hearing before it proceeded. The Constitution requires only a single hearing before an impartial decision maker. *See White v. South Park Independent School District,* 693 F.2d 1163, 1167 (5th Cir.1982). It is therefore unnecessary for this court to determine whether the members of the School Board who later conducted a *de novo* review, were prejudiced against Wells, for the post-termination procedures utilized complied with procedural due process.

### E. *Substantive Due Process*

Having determined that the school district afforded Wells procedural due process through constitutionally adequate post-termination procedures, this court must proceed to the second *Ferguson* inquiry, i.e., whether the decision of the administrative body to terminate Wells' employment for cause is supported by substantial evidence.

*See Ferguson,* 430 F.2d at 859. It is clear, of course, that in considering defendants' motion for summary judgment, the court must resolve all factual discrepancies in favor of Wells, the non-movant, and draw all reasonable inferences in his favor. *Wilson v. Taylor,* 658 F.2d at 1028.

 The court has reviewed the vast amount of evidence compiled and finds it compelling in support of the Council's decision to sustain Wells' discharge. While still in the employ of the school district, Wells repeatedly dismissed mounting criticism within the school administration and from the public, claiming to know 99% of what went on in his department. When confronted at the subsequent hearings, however, with evidence of illegal practices, of excessive charges for construction and maintenance, and of shoddy workmanship, Wells' most frequent response was that he didn't recall or was unaware of these.

Clearly the waste and disgrace suffered by DISD could not all be laid at the door of Weldon Wells. Many of the unethical and illegal practices in his department began during the tenure of the previous superintendent. Moreover, Wells' calls for additional staff had gone unheeded. Given the immensity of the projects to be completed within tight construction deadlines, a certain amount of human error was almost inevitable. Nonetheless, other irregularities, notably those involving the heating and air conditioning group, the abuse of open purchase orders, and the circumvention of Texas bidding law, escaped Wells' attention or were ignored by him for years. The record is replete with instances of Wells' general mismanagement and inefficiency in the operation of his department, as well as his failure to follow administrative policies and procedures prescribed by the Board.

Even after resolving all factual discrepancies in favor of Wells and drawing all reasonable inferences in his favor, the

---

**23.** The three general charges mentioned in Wright's letter of September 14, 1979 became eight specific counts. See *supra* at 502.

court concludes that the decision of the Administrative Council sustaining Superintendent Wright's decision to terminate Wells' employment is supported by substantial evidence.

Because the school district afforded Wells due process, albeit tardily, and substantial evidence supports Wells' discharge, defendants' motion for summary judgment on the plaintiff's due process claim is granted in part and denied in part. The school district ultimately accorded Wells due process, but only after improperly denying it to him prior to discharge. Remaining for resolution is the question whether Wells can prove at trial that the deprivation of pre-termination due process caused him to suffer mental distress and contributed to harm his career and reputation, warranting compensatory damages.

#### F. Back Pay

Plaintiff's motion for partial summary judgment urges the court that because Wells failed to receive pre-termination due process, it should award Wells back pay from September 14, 1979, the date of his termination, to June 10, 1980, the date of the School Board's decision following *de novo* review, as well as grant attorney's fees.

■■■ Although the summary judgment evidence conclusively establishes that DISD complied neither with constitutional requirements of pre-termination due process nor with its own policies, the law does not support Wells' assertion that he is entitled to back pay from the date of his termination to the date of the final hearing. To the contrary, where the discharge of a public employee is subsequently affirmed, he is not entitled to back pay that would have accrued during the period following the procedurally improper discharge. *Carey,* 435 U.S. at 260, 98 S.Ct. at 1050; *Laje,* 665 F.2d at 729–730; *Wilson v. Taylor,* 658 F.2d at 1033–35, *overruling Glenn v. New-*

*man,* 614 F.2d at 473 as to back pay. Since the Administrative Council, after hearing, affirmed the Superintendent's decision to terminate Wells' employment, and this decision is supported by substantial evidence, defendants have established that Wells would have been discharged even if he had been accorded proper pre-termination procedures. Consequently, Wells ·motion for partial summary judgment on the issue of back pay is denied.

■■■ Wells also urges that he should be awarded attorney's fees if the court determines that he was denied procedural due process prior to termination or after termination or both. Although the court has held that the school district denied Wells procedural due process prior to his termination, Wells must yet prove his claim to damages. If he prevails at trial, the customary rule is that he would be entitled to attorney's fees on the issue on which he was successful, absent special circumstances rendering such an award unjust. *See Familias Unidas v. Briscoe,* 619 F.2d 391, 405 (5th Cir.1980); *McCulloch v. Glasgow,* 620 F.2d 47, 52 (5th Cir.1980). Plaintiff's motion for attorney's fees will therefore be carried to trial.

#### G. Qualified Immunity

The defendant members of the Board of Trustees and Superintendent Wright claim that they are not liable to suit in their individual capacities because of their qualified immunity for acts undertaken in good faith. Both parties rely on *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), which enunciated a test involving both subjective and objective elements.[24] The Supreme Court's opinion in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), however, wrought a quiet revolution in the law of official immunities. *Saldana v. Garza,* 684 F.2d 1159, 1163–64, n. 15 (5th Cir.1982).

---

**24.** "... we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." *Wood* at 322, 95 S.Ct. at 1001.

In *Harlow* the Supreme Court adjusted the "good faith" standard of *Wood v. Strickland* to make it compatible with the court's oft repeated admonition that "insubstantial claims should not proceed to trial." *Harlow* 102 S.Ct. at 2737. Before *Harlow* was decided, lower courts had been denying summary judgment on the basis that an official's subjective good faith was a fact question requiring resolution by jury. *Id.* at 2737–38. To prevent disruption of effective government by broad ranging discovery and to save the costs of trial by permitting resolution of insubstantial claims on summary judgment, the Supreme Court discarded one prong of the *Wood v. Strickland* inquiry. Henceforth,

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the de-

fense would turn primarily on objective factors.

*Harlow* at 2739.

Although Wells' right to pre-termination notice and an opportunity to rebut in writing the charges against him was established prior to Wells' discharge,[25] the good faith affirmative defense of the individual defendants must be upheld on two grounds: (1) the decision in *Blair v. Robstown*, 556 F.2d 1331 (5th Cir.1977) had beclouded the year earlier case of *Thurston v. Dekle*, and (2) the Superintendent and Trustees were entitled to rely on house counsel and the DISD's outside attorneys[26] to warn them if they were acting improperly in sustaining the Superintendent's decision to immediately terminate Wells' employment.

The plaintiff in *Blair*, whose employment contract was not renewed, claimed that deprivation of a pre-termination hearing amounted to a denial of due process. The Fifth Circuit denied plaintiff relief, holding that a subsequent hearing satisfied any requirement that may have been imposed by the constitutional demands of due process. *Blair* at 1334–35. Outside counsel for the school district thus construed the *Blair* case[27] to mean, as the Fifth Circuit later did, "that any error (in pre-termination proceedings) was cured in the subsequent public hearing...." *Glenn v. Newman*, 614 F.2d 467, 472 (5th Cir.1980). Not until *Wilson v. Taylor*, 658 F.2d 1021 (5th Cir.1981), did the Fifth Circuit reconsider the limited extent to which post-termination procedures could effect a cure.[28] As a result, when the school board met on September 14, 1979, the law did not clearly forbid postponement of notice and a hear-

---

**25.** *See Thurston,* 531 F.2d 1264.

**26.** House counsel, Ben Niedecken, testified that he and three outside attorneys, George Dunlap, Bowen Florsheim and Bob Smith attended the meeting of September 14, 1979. The outside attorneys made an oral presentation to the Board.

**27.** At deposition, house counsel stated that one of the DISD's outside attorneys "indicated that they had researched the matter and their opin-

ion was that the case law was that although you didn't have a pretermination hearing, a post-termination hearing as soon as possible after the termination would cure that defect." Deposition of Niedecken at 15.

**28.** On remand the trial court was to consider evidence of actual damages arising from a deprivation of pre-termination due process, as well as punitive damages, but not award back pay. *Wilson* at 1032–35.

ing until after discharge, so long as the governmental entity ultimately complied with the requirements of procedural due process.

Deposition testimony in the record makes abundantly clear the extent to which the individual defendants relied upon the advice of counsel. Even those few trustees who believed they had read the personnel guidelines at some point prior to the hearing placed their confidence in the attorneys' knowledge of the law and in Wright, who had worked shoulder to shoulder with those attorneys during the investigations of the previous months.

At the emergency meeting several members of the Board expressed great concern that the Board should take the correct action.[29] Several remembered receiving a briefing from outside counsel at the September meeting, and recalled that considerable discussion took place as to whether this procedure was proper. Not until they had received repeated assurances from Wright that this was the correct course to follow, buttressed by the presence of the DISD's house counsel and outside attorneys, did the Board act to sustain the Superintendent's decision to terminate Wells without giving him prior notice and an opportunity to rebut the charges in writing.

Although the court finds no evidence from which the extent of Wright's reliance on the advice of counsel can be ascertained, such a determination is not essential since the law at that time was unclear. Because the attorneys employed to advise the School Board and administration in this matter believed that post-termination compliance could cure any pre-termination deficiency, Wright, as a public official, could not be fairly said to "know" that the law forbade postponement of notice and some type of hearing until after Wells' discharge. *See Harlow* 102 S.Ct. at 2739. As

laymen, the members of the Board and Wright clearly placed their trust in the attorneys at their elbow to shield them from liability and to ensure that they did not infringe upon Wells' rights. *Cf. Bomhoff v. White*, 526 F.Supp. 488, 492 (D.Ariz. 1981) (ignorance plus failure to consult an attorney do not justify avoidance of liability).

The defendants have established the affirmative defense of good faith. Their motion for summary judgment on this issue is therefore granted. Defendants are immune in their individual capacities from liability for actual damages.

### H. *Punitive Damages*

Defendants next contend that they are also not individually liable for punitive, as opposed to compensatory, damages because they acted in good faith, *i.e.*, without malice. *Cf. Smith v. Wade*, — U.S. —, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (punitive damages recoverable on showing of evil motive or reckless or callous indifference to federally protected rights). This contention is well founded. Moreover, the most prominent purposes of 42 U.S.C. § 1983 are compensation and deterrence. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981).[30] These purposes will be accomplished in this case without an award of punitive damages.

A body of local government such as the DISD is immune from punitive damages under 42 U.S.C. § 1983 because a municipality can have no malice independent of the malice of its officials. *City of Newport v. Fact Concerts, Inc., supra*, at 267, 101 S.Ct., at 2759. In view of the conclusion that the individual members of the school board acted in good faith, punitive damages may not be assessed against them or the governmental entity,[31] and

---

**29.** One trustee had taught Wells' children and another had been a neighbor for years.

**30.** The Supreme Court reasoned that an award of punitive damages against a municipality punishes only taxpayers, who took no part in the commission of the wrong. Since such damages are over and above the amount necessary to

compensate the injured party, there is no question of equitably distributing the losses. *See City of Newport* at 267, 101 S.Ct. at 2759.

**31.** An entity of local government may not however assert the good faith of its officers or agents as a defense to its own liability for compensatory damages. *City of Newport* at 259, 101

summary judgment must be granted for defendants on this claim. *See Bomhoff,* 526 F.Supp. at 493.

## IV. *The Liberty Interest*

Wells claims that Superintendent Wright deprived him of a due process liberty interest because Wright publicly, in an official manner, expressed false and stigmatizing statements about Wells' employment performance. Wells also claims that Trustee Sarah Haskins made salacious and stigmatizing charges to other trustees during the course of the hearings.

■ A liberty interest derives from one's reputation and the employment opportunities which it creates. An interest in liberty is implicated when charges of dishonesty or immorality are leveled or when the employer imposes a stigma which bars an individual from other public employment. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573–74, 92 S.Ct. 2701, 2707–08, 33 L.Ed.2d 548 (1972). In the case of Wells, the serious nature of the charges leveled by the DISD mention of and Wells' name in the public statement issued after the trustees' emergency meeting on September 14, 1979, may well have involved Wells' liberty interest.

■ A· constitutional deprivation of liberty does not occur, however, unless there is also a subsequent denial of procedural due process to redress that injury. *See In re Selcraig,* .705 F.2d 789, 795–96 (5th Cir.1983). A maligned employee has a right to a procedure that will afford him a right to refute unfounded charges, *i.e.,* a hearing, but that hearing need not precede publication.[32] *See Selcraig* at 798. *See*

*also Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977).

■ Wells does not dispute that the defendants engaged in two lengthy hearings at which he could have cleared his name. The court has determined that, at the least, the first hearing before the Administrative Council complied with procedural due process. That the school district afforded Wells a name-clearing hearing, but that Wells requested that the hearing be closed to the public undercuts his assertion that defendants deprived him of a liberty interest in his reputation and career opportunities.[33] Wells has failed to establish all of the essential elements for a § 1983 claim for denial of procedural due process implicating a liberty interest: (1) publication of stigmatizing charges, (2) injury to employment, and (3) the denial of a name-clearing hearing. *See Wells v. Doland,* 711 F.2d 670, 676 (5th Cir.1983). Because defendants did not deny Wells a name-clearing hearing, Wells cannot establish the liability of defendants under 42 U.S.C. § 1983 for depriving him of a liberty interest. Accordingly, summary judgment must be granted for defendants on this claim.

## V. *Costs*

■ In view of· the cost of the two lengthy transcripts of the administrative proceedings, defendants move that these costs be taxed against plaintiff as authorized by 28 U.S.C.A. § 1920(2). That statute permits a judge to tax as costs the fees for "all or any part of the stenographic transcript necessarily obtained for use in the case." It must, however, be read in conjunction with Fed.R.Civ.P. 54(d) that costs should be allowed as of course to the pre-

S.Ct. at 2755, citing to *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

**32.** In this respect, the *Selcraig* opinion sheds an interesting light on what approaches a duty of governmental officials to keep the public informed:

The reply to press inquiry by DISD officials was not per se improper, even if it led to the publication of derogatory information. Pub-

lic officials are not obliged to stonewall. They act properly when they respond to public inquiry. If, however, they do respond, they are obliged thereafter to afford procedural due process to the person charged. *Selcraig* at 798.

**33.** The danger such a plaintiff encounters is that a public hearing may demonstrate the verity of some or all of the charges. *See Selcraig* at 796.

vailing party unless the court otherwise directs. The trial court enjoys great latitude and discretion in the awarding of costs. *See U.S. v. Kolesar*, 313 F.2d 835, 836 (5th Cir.1963); *Viverette v. Lurleen B. Wallace State Junior College*, 587 F.2d 191, 194 (5th Cir.1979).

At this stage, neither party has prevailed on all the issues. Because plaintiff must yet present proof on damages, an essential element of his case, the court will carry defendants' motion to trial. The award of costs will abide the judgment ultimately rendered.

### VI. *Conclusion*

In summary, defendants' motion for summary judgment is DENIED with respect to Wells' claim of damages for deprivation of due process prior to discharge and with respect to defendants' claim for taxation of costs against Wells. These claims, as well as Wells' claim for attorney's fees, must await resolution at trial. On all other issues, defendants' motion for summary judgment is GRANTED. Plaintiff's motion reurging partial summary judgment is DENIED.