**D.A. DELAHOUSSAYE, Louisiana Rice Properties, Inc., Rice Capital Sales, Inc., Del Rico, Inc.**

v.

**Richard SEALE, Robert (Bob) Odom, Gilbert Lyons, Manning J. Broussard, William G. Boudreaux.**

Civ. A. No. 83–0730.

United States District Court, W.D. Louisiana, Lafayette-Opelousas Division.

April 11, 1985.

Louis M. Phillips, Taylor Proter, Brooks & Phillips, Baton Rouge, La., for plaintiffs.

Edwards, Stefanski & Barousse, Homer Ed Barousse, Jr., Crowley, La., for Richard Seale.

C. James Gelpi, New Orleans, La., for Bob Odom.

F. Jefferson Millican (PLC), Jennings, La., for Gilbert Lyons.

Pugh & Boudreaux, Charles J. Boudreaux, Sr., Lafayette, La., for Manning J. Broussard & William G. Boudreaux.

## RULING

SHAW, District Judge.

Now before the Court is the motion of all five defendants (Robert Odom, Richard Seale, Gilbert Lyons, Manning Broussard and William Boudreaux) to reconsider denial of summary judgment, and the two separate summary judgment motions of defendants Broussard and Boudreaux and of defendants Lyons and Seale. For the reasons hereinafter set out, the summary judgment motion filed by all defendants is hereby GRANTED; therefore, the remaining summary judgment motions are moot.

Plaintiffs in this case have brought an action under 42 U.S.C. § 1983, alleging that defendants "used their positions as Warehouse Commission and Louisiana Department of Agriculture officials to arbitrarily deprive and violate plaintiffs' constitutionally protected property right to operate one's business pursuant to State License and otherwise without arbitrary, unlawful governmental intrusion and interference." [1]

The plaintiffs, three Louisiana corporations and Deblanc Delahoussaye, a part owner and officer of the three corporations, allege that on March 26, 1982, defendants Odom, Seale and Lyons voted as a majority of the Louisiana Warehouse Commission (the Commission) to suspend the warehouse license of plaintiff Louisiana Rice Properties, Inc. (LRP) because of economic problems faced by a related corporation, Southwest Louisiana Grain Corporation (Southwest Grain).

Defendants claim that their action was justified by an audit and examination of LRP's Unit 4 (Southwest Grain), which revealed that Southwest Grain was unable to meet its financial obligations to farmers and carried a debt of over $600,000.00. Delahoussaye confirmed these findings in a meeting with defendant Odom on February 25, 1982. According to defendants, Southwest Grain did not hold a warehouse license but did hold a grain dealer's license, and speculation in the sale of grain had caused the failure of Southwest Grain. Defendants suspended LRP's warehouse license because of its close interconnection with Southwest Grain [2] and "its ability to generate much needed cash through the issuance of warehouse receipts on and the sale of grain not belonging to it and the history that others similarly situated had done so." [3]

According to plaintiffs, however, defendants knew that LRP was a distinct corporate entity and had not violated any state statutes. Plaintiffs also claim that they did not receive notice of the Commission's suspension until March 31, when plaintiff Delahoussaye received a letter from Odom advising that the warehouse license held by LRP had been suspended under the authority of LSA–R.S. 54:257 "because of discrepancies in your warehouse audit." The letter was hand delivered by defendant Boudreaux, assistant director of the Commis-

1. Plaintiffs' Memorandum in Opposition to Motion to Dismiss, May 27, 1983, at 3.

2. Defendants claim the two corporations were family-owned and closely interconnected both operationally and financially, as evidenced by

their common officers, boards of directors and bookkeepers.

3. Defendants' Brief and Supporting Documents in Support of Motion for Summary Judgment, October 1, 1984, at 4–5.

sion. Boudreaux was also one of three inspectors allegedly sent on March 31 to inspect and audit the books of LRP, *after* the written notification of suspension was delivered. Following their inspection, these inspectors determined that there were no discrepancies in LRP's warehouse receipts book. Plaintiffs claim that Odom had also directed the inspectors to take over the operations of Rice Capital Sales, Inc. and Del Rico, Inc., but that the books of these corporations were never inspected.

Furthermore, plaintiffs complain that defendants advised a Monroe newspaper of their intention to seize control of "facilities operated by" LRP on March 30, even though the inspection was not to be performed until the next day. On March 31, defendants and press officer Larry Michaud informed other media across the state that the Louisiana Department of Agriculture had seized and closed LRP as well as the three facilities owned by Delahoussaye in Kaplan because they owed $600,000 to area farmers. Plaintiffs allege that defendants knew that LRP was a distinct entity and that the audit by the inspectors had revealed no discrepancies or violations by the time of these communications. Several newspapers printed the information released by defendants on April 1.

On April 2, Larry Michaud advised Delahoussaye that defendants had made a mistake and that they would issue a retraction. The Commission held a hearing on April 23 wherein it determined that the warehouse license of LRP would be reinstated. Plaintiffs allege that no retraction was issued until April 27, 1982, when Louisiana newspapers were advised that the warehouse license of Louisiana Rice Properties had been reinstated.

According to plaintiffs, the decision to "close down" and suspend the warehouse license of Louisiana Rice Properties, the arbitrary seizure of Rice Capital Sales and Del Rico and the communication of these unlawful actions to Louisiana newspapers and media constituted violations of section 1983. Plaintiffs claim they have suffered injury to their corporate reputations and have suffered financial losses as a direct result of defendants' actions, including the refusal of many suppliers to continue to provide inventory on credit and serious cash flow problems. Plaintiffs have also alleged a pendent state claim under LSA–C.C. art. 2315 for tortious interference with plaintiffs' business and damage to the businesses' reputations. Plaintiff Delahoussaye has also brought a separate state libel action, alleging that defendants announced to the media on March 31 that the Department of Agriculture had audited Delahoussaye personally and found that he owed area farmers $600,000 as owner of Louisiana Rice Properties.

There are two essential elements to any section 1983 action. First, the conduct complained of must have been committed by a person acting under color of state law, which is not disputed in this case. Second, defendants' conduct must have deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Viewed in the light most favorable to plaintiffs, the complaint in this case asserts only two constitutional violations: the deprivation of liberty and property interests without due process of law, in violation of the due process clause of the fourteenth amendment.

The fourteenth amendment encompasses violations of both procedural and substantive due process. Generally, substantive due process claims involve conduct which infringes upon certain provisions of the Bill of Rights made applicable to the states through the fourteenth amendment. Due process standing alone also has a substantive aspect in cases of serious physical violence involving conduct that shocks the conscience, *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952); *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981); and *may* in cases of excessive abusive behavior, with a caveat that "implication of nontextual substantive rights from the general monitions of the due process clause is a matter not to be undertaken lightly but

only with the caution of seasoned and mature thought." *Rutherford v. United States*, 702 F.2d 580, 584 (5th Cir.1983). Although the Supreme Court outlined the appropriate analysis of *procedural* due process claims in *Parratt*, 451 U.S. at 527, 101 S.Ct. at 1908, the restrictive *Parratt* analysis does not apply to these *substantive* due process violations. *Thibodeaux v. Bordelon*, 740 F.2d 329 (5th Cir.1984).[4]

The plaintiffs have alleged no substantive due process claims in this case, however, for the temporary suspension of their licenses and injury to their business reputations. The Fifth Circuit has held that "the fourteenth amendment provides only procedural protection against injury inflicted by state officers" to reputation interests. *In re Selcraig*, 705 F.2d 789 (5th Cir.1983). Nor have plaintiffs characterized the temporary license suspension as "conscience shocking" or excessively abusive conduct which is inherently impermissible. *Schiller v. Strangis*, 540 F.Supp. 605, 614–15 (D.Mass.1982). Therefore plaintiffs can only claim that the state has unlawfully interfered with protected property or liberty interests[5] by failing to provide adequate *procedural* safeguards; that the procedures used by the state were inadequate in light of the significance of the affected interests. *Schiller*, 540 F.Supp. at 613.

■ Accordingly, whether plaintiffs have alleged a cognizable violation of their fourteenth amendment right to procedural due process involves a *dual* inquiry: were they deprived of a protected interest, and if so, was the deprivation accomplished without adherence to due process standards? *Findeisen v. North East Independent School District*, 749 F.2d 234, 237 (5th Cir.1984). The first question under the procedural due process analysis is thus whether plaintiffs have been deprived of a *protected* liberty or property interest.

■ Addressing first the temporary license suspension, this Court finds that the warehouse license does fall within the definition of "property." *See, e.g. Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). There is a question of fact as to whether plaintiffs were actually *deprived* of this property interest, since the three companies were apparently allowed to continue operations. Yet, plaintiffs claim that the license was not reinstated until April 27, almost a month after they received notice of the suspension. For the purposes of this ruling, the Court will assume that plaintiffs *were* actually deprived of the property interests alleged.

Plaintiffs also alleged injury to their business reputations by the defendants' March 30 and 31 communications to the area media. In *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976), the Supreme Court held that "reputation alone, apart from some more tangible interest such as employment, is [not] 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." The Court held that a federally recognized liberty interest is implicated only when an individual's reputation is stigmatized in connection with the denial of some specific constitutional guarantee or some "more tangible" interest. *Id.* at 700–01, 96 S.Ct. at 1160. The Fifth Circuit has found constitutional deprivations of liberty when there have been additional injuries to employment or other interests—stigma "plus" the loss or denial of another right. *In re Selcraig*, 705 F.2d at 789; *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir.1980).

Moreover, the " 'plus' of the stigma-plus requirement need not itself be a protected liberty or property interest." *Marrero*, 625 F.2d at 513 n. 17. In this case, the

---

**4.** As the Fifth Circuit noted in *Thibodeaux*, 740 F.2d at 338 n. 9, however, "[a]s the particular liberty interest at stake increases in importance, the adequacy of a postdeprivation damages remedy may decrease." At some point the individual interest becomes so important that the impossibility of a prior hearing will not justify allowing a postdeprivation remedy to satisfy proce-

dural due process requirements. "At such a point, procedural due process shades into substantive due process, and *Parratt* becomes inapplicable." *Id.*

**5.** In *Thibodeaux, supra,* the court made no distinction between deprivations of property and liberty interests.

temporary suspension of plaintiffs' warehouse license in addition to the reputational injuries would constitute a "more tangible interest" sufficient to implicate a protected liberty interest. The Court will once again assume that the plaintiffs did suffer the reputational injury alleged from the defendants' communications for the purposes of this motion.

Once a protected interest is found, then the question is raised as to whether adequate *procedures* were provided. As the Fifth Circuit stated in *Marrero*, 625 F.2d at 519, "[i]n order to state a claim under the fourteenth amendment, the complainant must allege facts showing not only that the State has deprived him of a liberty or property interest but also that the State has done so without due process of the law." Although plaintiffs have never argued that they were not accorded adequate procedural safeguards,[6] this remains the only basis for plaintiffs' claim.

In this case, Louisiana law specifies the plaintiffs' only procedural rights for suspension of warehouse licenses, providing that:

The commission may temporarily suspend the license of any warehouse or warehouse company found violating any provision of this Chapter or the rules and regulations adopted under it.

Within ten days of the suspension, the commission shall hold a hearing at which the suspended warehouse or warehouse company shall be heard in opposition to the suspension and its continuance.

LSA–R.S. 54:257. Therefore, the state has authorized certain post-deprivation reme-

dies[7] which are provided within ten days of the temporary suspension. The question remains whether these state-provided remedies were adequate or satisfied the relevant due process standards.

In *Parratt*, the Supreme Court noted that many of its decisions required that a hearing take place *before* the state interfered with a liberty or property interest of its citizens. In these cases the deprivation was authorized by state procedure and thus it was possible for the state to provide notice and a hearing before the deprivation occurred. *Thibodeaux*, 740 F.2d at 334, *citing Parratt*, 451 U.S. at 537–38, 101 S.Ct. at 1913–14. On the other hand, the Court noted that other decisions have held that state post-deprivation remedies could satisfy the due process clause. *Id.* *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The Court added that:

[t]hese cases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process can, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, satisfy the requirements of procedural due process ... we have rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property. This rejection is based in part on the impracticability in some cases of providing any preseizure hearing under a state-authorized proce-

---

**6.** Opposition to Motion for Summary Judgment, Nov. 14, 1984 at 16. ("It is clear that LSA R.S. 54:247 does not provide for presuspension hearings. Reserving the right to urge at a later date that the statute is defective for this reason, plaintiffs assume for purposes of argument that the statute is constitutional on its face.")

**7.** The Supreme Court established a three-prong balancing test to determine the sufficiency of state-provided deprivation remedies in *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The test weighs: (1) the private interest that will be affected, (2) the risk of an erroneous deprivation of that interest by

the procedures being used, and (3) the government's interest in the matter. *Id.* at 335, 96 S.Ct. at 903. Although it is not necessary to apply the test in this case, the Court finds that the post-suspension hearing will adequately protect the plaintiffs' liberty and property interests under this test. In weighing the various interests involved, ten days does not seem an unreasonable delay for such a hearing. Nor does there seem to be a high risk of erroneous deprivation from the state procedures, which are only "temporary" until the hearing is conducted. Moreover, plaintiffs have not challenged the constitutionality of the state statute or procedures.

dure, and the assumption that at some time a full and meaningful hearing will be available.

*Parratt,* 451 U.S. at 539–41, 101 S.Ct. at 1914–16.

Therefore the relevant inquiry under the *Parratt* analysis is whether the deprivation occurred through an established state procedure, since the Supreme Court held in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), that post-deprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than "random and unauthorized action." As the Supreme Court stated in *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984),

> [t]he underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur.

In *Hudson,* the court also applied the *Parratt* analysis to *intentional* deprivations of property, noting that "intentional acts are even more difficult to anticipate."[8] *Id.* Moreover, the court noted that even though a state agent who intends to deprive a person of his property *can* provide predeprivation process, "[w]hether an individual employee himself is able to foresee a deprivation is of no consequence. The controlling inquiry is solely whether the State is in a position to provide for predeprivation process." *Id.* 104 S.Ct. at 3204.

Regarding plaintiffs' alleged deprivation of a property interest in their warehouse license, it is clear that the deprivation did not occur as a result of an established state procedure. To either negligently or intentionally suspend the license of a solvent business can only be characterized as random and unauthorized. As in *Hudson,* the

state is unable to foresee the potential negligent or intentional deprivation of a license or property interest, rendering predeprivation process impracticable. Furthermore, the state has provided a full and meaningful hearing within a reasonable time after the deprivation.

On the other hand, *Logan v. Zimmerman Brush Company, supra,* is a classic example of a deprivation effectuated through an established state procedure which destroyed the claimants' entitlement without according him proper procedural safeguards. Therein, Zimmerman Brush Company discharged the plaintiff purportedly because his short left leg made it impossible for him to continue as a shipping clerk. Logan brought his unlawful discharge complaint to the Illinois Fair Employment Practices Commission. The Commission, apparently through inadvertence, scheduled the necessary conference for five days after the expiration of the statutory limitation period for claims. The Illinois Supreme Court held that Logan's claim was thereby extinguished, but the United States Supreme Court reversed.

It is clear that Logan's loss happened by operation of law. Logan had a state-created property interest which the state cannot destroy at will. Logan received no hearing and some form of hearing is a *sine qua non* before he could finally be deprived of a protected property interest. *Unlike Logan, here the plaintiffs are challenging the Commissioner's error, not the established state procedure.* As the Fifth Circuit stated in *Marshall v. Norwood,* 741 F.2d 761, 763 (5th Cir.1984), "[i]n *Parratt,* the Supreme Court distinguished between 'a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the *misconduct of state officers.*' 451 U.S. at 542 [101 S.Ct. at 1916]." (Emphasis added.)

---

**8.** The Supreme Court stated in *Hudson* that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the State's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." 104 S.Ct. at 3203.

Furthermore, in *Parratt* the Supreme Court held that when the state provides an adequate and independent tort remedy for the deprivation, even though the remedial process comes *after* the deprivation has occurred, the state remedy constitutes sufficient due process under the fourteenth amendment. 451 U.S. at 543–44, 101 S.Ct. at 1916–17. Louisiana law affords plaintiffs a tort cause of action against all of the defendants in this suit. Plaintiffs have conceded this by taking advantage of the available state remedies, attaching pendent state claims under La.Civil Code article 2315 *et seq.* The availability of this remedy provides the plaintiffs with all the process that is due, and their complaint should therefore be dismissed.

An additional argument that defendants could have made is that the same legislation which created the property entitlement to a warehouse license also created the procedure for its suspension and the opportunity for a hearing to oppose the suspension. How then can the plaintiffs expect to have any entitlement to a pre-suspension hearing? The only guarantee the state provides is a post-suspension hearing in clear and unequivocal terms. It may be said that plaintiffs could expect no more.[9]

■ Plaintiffs also claim that they were deprived of a liberty interest through the alleged injury to their business reputations. The Fifth Circuit specifically outlined the requirements for establishing denial of due process for *reputational* injuries in *Selcraig*, 705 F.2d at 797, including showing publication of the charges, injury to business or employment, and denial of a name-clearing hearing. According to the court, "[p]ublication is shown by official interviews with the press." *Id.* In this case, the Commission issued press releases concerning the license revocation. Yet even assuming that plaintiffs have been "injured" by the communications, just as in *Selcraig* they have *not* shown that defend-ants deprived them of their right to a hearing.

In *Selcraig*, the plaintiff had *waived* his right to a due process hearing when he "settled" his dispute with defendants. 705 F.2d at 793. Similarly, in this case plaintiffs agreed in a telephone conversation on March 31 that "the hearing previously set for April 7, 1982, in accordance with LSA–R.S. 54:257, would be set aside without date."[10] Thus the defendants waived their right to a name-clearing or post-deprivation hearing, the only procedural remedy afforded by statute. Moreover, *Selcraig* held that procedural rights for this type of violation do not need to *precede* publication. *Id.* at 798. *See also Wells v. Dallas Independent School District*, 576 F.Supp. 497, 510 (N.D.Tex.1983) ("a maligned employee has a right to a procedure that will afford him a right to refute unfounded charges, i.e., a hearing, but that hearing need not precede publication.")

In summary, plaintiffs do not contend that more exacting procedural safeguards should have been imposed by the State before the imposition of plaintiffs' license suspension. In fact, plaintiffs concede the constitutionality of the statutes under which the state acted as well as the adequacy of the available state tort remedies. What the plaintiffs do claim is that their deprivation resulted from the faulty determination made by the state to suspend plaintiffs' license. Whether the state's conduct can be considered negligent or intentional, it is clear that it was not pursuant to any established state procedure but was random and unauthorized. It is also clear that predeprivation safeguards to prevent the occurrence of this type of alleged conduct are not practical or feasible. Further, the plaintiffs do not contend that they are entitled to any additional predeprivation safeguards, or even remotely suggest what

---

9. The alleged deprivation of a liberty interest ("stigma"), however, could be more complicated, *see, Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), but the distinction between a property or liberty interest in this context may not be tenable.

10. Defendants' Brief and Supporting Documents in Support of Motion for Summary Judgment, October 1, 1984, at Exhibit C.

they might be. It has been said that due process does not mean perfect process.

■ One final issue that might have been raised to support the defendants' position is the doctrine of sovereign immunity under the eleventh amendment, barring suits against a state by its own citizens or citizens of other states. Likewise, the eleventh amendment bars suits against state officials, agencies or employees when the state is the real, substantial party in interest. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). Eleventh amendment immunity applies unless a federally created right is at issue or a state has either consented to suit in federal court or waived application of the eleventh amendment. *Parden v. Terminal Railroad Co.*, 377 U.S. 184, 186, 84 S.Ct. 1207, 1209, 12 L.Ed.2d 233 (1964).

*Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), recognizes an important exception to this general rule, holding that a suit challenging the federal constitutionality of a state official's action is not one against the state. Yet the *Young* exception serves only to permit a federal court to grant *prospective* injunctive relief; federal courts remain barred under the eleventh amendment from granting legal or equitable *retroactive* relief. *Chiz's Motel v. Mississippi State Tax Commission*, 750 F.2d 1305 (5th Cir.1985), *citing Pennhurst* 104 S.Ct. at 909–10. Furthermore, the need to promote the supremacy of federal law recognized in *Young* is absent when the plaintiff alleges that a state official has violated *state* law, as in this case. When a federal court instructs state officials on how to conform their conduct to state law, this conflicts directly with the principles of federalism that underlie the eleventh amendment. *Pennhurst*, 104 S.Ct. at 909.

■ In this case, the defendants are all state officials who acted within the sphere of their official responsibilities in conformance with the state guidelines for termination of warehouse licenses. The defendants had nothing to gain personally from their conduct, as in *Pennhurst*, although there remains a question as to whether they acted negligently or even willfully. As the court stated in *Pennhurst*, "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." *Id.* 104 S.Ct. at 917. Louisiana law provides that the state shall hold harmless and indemnify all officers and employees of the state from any financial loss arising out of any claim, demand, suit or judgment in federal court brought under 42 U.S.C. §§ 1981 through 1983 in the event the officer or employee was acting in the discharge of his duties and within the scope of his employment. LSA–R.S. 13:5108.1. Therefore, any liability for defendants' actions rests with the Department of Agriculture and on the state of Louisiana. La.Civ. Code arts. 3021, *et seq.* Although it could be argued that this statute constitutes a *waiver* of eleventh amendment immunity, Louisiana law expressly provides that "[n]o suit against the state, state agency or political subdivision shall be instituted in any court other than a Louisiana state court." LSA–R.S. 13:5106.

For the foregoing reasons, the motion for summary judgment filed by defendants is hereby GRANTED.