**Scott DRESSLER, Plaintiff,**

v.

**Kenneth C. JENNE, II, in his official capacity as Sheriff, Defendant.**

**No. 98–6041–CIV.**

United States District Court,
S.D. Florida.

March 2, 2000.

William R. Amlong, Ft. Lauderdale, FL, for Plaintiffs.

Charles Whitelock, Todd W. Shulby, Ft. Lauderdale, FL, for Defendants.

### AMENDED ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GOLD, District Judge.

**THIS CAUSE** is before the court upon defendant Ken Jenne's [1] motion for summary judgment (DE # 75) and plain-

1. Ken Jenne is the current Sheriff of Broward County and is being sued in his official capacity as Sheriff of Broward County. Jenne's predecessor, Sheriff Ron Cochran, passed away before this action was filed. Cochran is the source of Dressler's alleged injuries in this case. Jenne is therefore standing in the shoes of Cochran for purposes of this lawsuit.

tiff Scott Dressler's motion for partial summary judgment (DE # 86). Having considered the parties' arguments and evidence in the record, the court grants defendant's motion for summary judgment.

## I. Factual Background

Scott Dressler is an Assistant State Attorney who, until he was fired by Sheriff Cochran, also served as a reserve deputy in the Broward Sheriff's Office.[2] This lawsuit arises out of a series of events surrounding the February 8, 1996 arrest of Oren Steinfeldt for exposing his genitals to four children under the age of 16. Steinfeldt is the 74 year old uncle of Barbara Miller. Barbara Miller is friends with Sheriff Cochran and she served as Cochran's campaign manager in 1992 and 1996. *See* Miller Depo. at 4. When Miller found out from her aunt that her uncle had been arrested, she called Cochran to try to find out were her uncle was being held. Miller Depo. at 6. Cochran found out for Miller that Steinfeldt was being held at the BSO's main jail, and he called Miller back to tell her. Steinfeldt was released on February 9, 1996 after posting $40,000 in surety bonds.

Dressler was a political supporter of Lawrence C. (Chris) Roberts who was running against Cochran for Sheriff at that time in 1996. *See* Dressler Depo. 41–42, 47–48. Dressler had attended five to six campaign functions, contributed money to the campaign, and once folded literature at the campaign headquarters. *See id; see also* Pl. Response at 8 n. 8. Dressler claims that on February 12, 1996, as he was walking up the courthouse steps, Roberts stopped him and mentioned to him that Cochran may have been involved in some wrongdoing. *See* Dressler Depo. at 93. Dressler claims he had not heard about this incident prior to Roberts telling him about it.[3] *See id.* Dressler advised Roberts to contact John Countryman who was in charge of the Special Investigation Unit. *See id.* at 95. Later that day, Chris Presley, an economic crimes detective in the Sheriff's Office, telephoned Dressler to tell him that he understood that Mitchell Kogod, the deputy who made the arrest, was being pressured to reduce the charges. *See id.* at 97–100. Presley suggested that Dressler call Kogod. *See id.* Dressler knew Kogod from the police academy—they graduated together. *See id.* at 100. Dressler spoke to Kogod on the phone,

2. The court conducted an independent review of the record to attempt to ascertain exactly what Dressler's duties were as a reserve deputy, in order to understand the magnitude of the liberty interest at stake. Dressler's primary job is as a full-time prosecutor in the State Attorney's Office. Dressler's attorney, Mr. Amlong, stated that Dressler had worked as a prosecutor for 15 years. Mr. Amlong clarified at oral argument that the reserve deputy position that is at issue in this case is a part-time community service. The court pressed Mr. Amlong to point to the places in the record describing the nature of Dressler's duties and benefits as a reserve deputy. Amlong stated that Dressler wore a Sheriff's uniform, carried a gun, carried a badge, made arrests, and earned $6.72 an hour. Amlong could not, however, point to places in the record containing this information, and he did not accept the court's invitation to submit a supplemental statement directing the court to the places in the record containing evidence of the nature of Dressler's position as a reserve deputy. The only evidence the court found in the record after an exhaustive search was on page six of Dressler's statement to Sergeant Sylvia Pechuls where he explained his duties as reserve deputy: "I have various functions I basically work at the various areas in the agency depending upon where they have a need and necessity. At times I've worked *Misdemeanor Warrants,* I've worked with the Juvenile Unit, I've worked Road Patrol in District I and several other districts depending upon the need and the assignment through the Reserve Unit." Understanding the nature of Dressler's employment as a reserve deputy is important for the court to give the proper weight to Dressler's liberty interest claims.

3. In his memo of February 13, 1996 set out below, Dressler says he received a call from Det. Chris Pressley on February 12, 1996. Dressler claims in the memo, contrary to what he says in his deposition and his administrative statement, that he did not see Roberts until the next day.

and according to Dressler, Kogod told him he had arrested Steinfeldt and after Kogod got home the night of the arrest, someone from booking called him to say the charges should be changed from felonies to misdemeanors. *See id.* at 104.

Dressler went to his supervisor, chief assistant state attorney Ralph Ray, and told him what he had learned. Ray told Dressler to write a memo. *See id.* at 119. Dressler's memorandum of February 13, 1996 reads as follows:

On February 12, 1996, I received a call from Detective Chris Presley with BSO, who indicated that Deputy Mitch Kogod made an arrest on an individual for indecent assault and the Sheriff may have been involved in putting pressure on the Deputy to change the charge. He asked me to call Deputy Kogod. I paged Deputy Kogod who called back and indicated the following;

1. That he arrested the above subject on four counts of indecent assault on Thursday, February 8, 1996, under F.S. 800.04.

2. Deputy Kogod was directed to call the Sheriff by a supervisor to discuss the arrest and did inform the sheriff of the incident.

3. He received a call from BSO booking and the individual, (no name given) was suggesting there was a problem with the charges and the ages of the victims in the p.c.

4. Deputy Kogod responded by saying there was no problem with the probable cause affidavit. He indicated that the booking officer was suggesting the charge be exposure 1 ˜mm under 800.03, without directly asking him to change his p.c. or reports. Kogod indicated that he was scheduled to handle a detail at the condo where the arrestee lives because of a scheduled meeting with the residences of the condo and possibly the sheriff.

On February 13, 1996, Chris Roberts stopped me in the hall, and stated he had information concerning the above incident, and that the situation should be investigated.

I informed Roberts to contact John Countryman, who would be responsible in conducting any investigation.

Roberts called later in the day to inform me that he felt booking Sgt. McCormes would have direct information concerning the sheriffs involvement in the above incident, as well as the defendant's release on bond without following standard procedures.

He further believes Charles Whitelock arranged the defendants bond with the bondsman.

Prior to issuing the memorandum, Dressler called Kogod. Kogod claims that he specifically told Dressler, "listen Scott ... I'll tell you the same thing I told everyone else [from Roberts' campaign] and the same thing I told you before ... nobody has asked me to lie for them, I haven't lied for anybody, nobody has asked me to change any of my stories, nobody has asked me to change any of me reports, the only thing I've heard are rumors and every rumor that I have heard has been from nobody from the Sheriff's Office." *See* Kogod Statement (Def. SJ Mot. Exhibit 17) at 17–18. Kogod also denies having told Dressler that the booking officer ever suggested the charge should be a misdemeanor. *See id.* at 19–20. Kogod says he only told Dressler it was a rumor. *See id.* Bernard McCormes, the booking officer, states that there was never any discussion that the charges should be reduced to a misdemeanor, instead there was a discussion as to whether Steinfeldt was entitled to a $10,000 bond or whether he was not entitled to be released on bond at all. *See* McCormes Statement (Def. SJ Mot. Exhibit 21) at 7–9, 11–12.

On February 27, 1996, Assistant State Attorney John Countryman issued a Special Prosecutions Closeout Memo concerning Dressler's allegations that the Sheriff had interfered with the arrest and processing of Steinfeldt. The memo stated in part:

In conclusion, there is no evidence whatsoever that Sheriff Cochran committed any offense or that he sought or demanded any favors or special treatment for Steinfeldt. What is apparent is that the case against Steinfeldt appears to be wholly unaffected by Sheriff Cochran's phone calls to the Booking Division and Deputy Kogod. Since there is no evidence of criminal misconduct, this matter is being closed without further action.

On the same day, the Sun–Sentinel came out with a story about the controversy surrounding this incident. Def. SJ Mot. Exhibit 25.

Sgt. Sylvia Pechuls, the Professional Compliance Investigator assigned to the case, was placed in charge of an investigation into Dressler's conduct. Dressler provided a two hour and 15 minute sworn taped administrative statement to Pechuls, mostly responding to Pechuls's questions, on March 20, 1996. Dressler was instructed not to talk about the investigation with anyone other than his attorney until it was over. *See* Def. SJ Mot. Exhibit 22 at 3–4. At the conclusion of the investigation, Pechuls prepared an Investigative Report ("OPC Report") setting forth the evidence discovered during the investigation. This report is attached as Exhibit 1 to defendant's motion for summary judgment. Dressler was charged with violating § 2.2.39 of the Broward Sheriff's Office Policy and Procedures Manual for Conduct Unbecoming an Employee and violating § 2.2.43 for being untruthful in official reports and BSO matters.[4] The 11 member professional standards committee met on July 2, 1996. The committee made a nonbinding recommendation to Sheriff Cochran to fire Dressler. Dressler had a pre-disciplinary conference on August 15, 1996

where he was given the opportunity to offer additional witnesses, evidence, or make additional statements regarding the charges against him. *See* Def. SJ Mot. Exhibit 36. The PSC recommendation was upheld and the Sheriff terminated Dressler on October 21, 1996.

Dressler filed a three count complaint under 42 U.S.C. § 1983 claiming a violation of his 14th Amendment right to procedural due process in that he was deprived of his liberty interest in his reputation through the stigmatization by the "sham" investigation (Count I), violation of his First Amendment rights through retaliatory discharge for his exercise of his freedom of speech about a matter of great public importance (Count II), and for injunctive relief, including reinstatement and the expungement of his disciplinary record (Count III). Defendant moves for summary judgment on Counts I and II, and plaintiff has filed a cross motion for summary judgment as to Count I. The court heard oral argument in this case on December 23, 1999.

## II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642,

---

**4.** § 2.239 reads: *"Conduct Unbecoming an Employee* Since conduct of employees on/off duty may reflect directly on BSO, they should conduct themselves at all times in a manner which does not discredit themselves, BSO, or the county."

§ 2.243 reads: *"Official Reports/Truthfulness in BSO Matters* A. Employees will not

make false statements in verbal/written communications on official matters. B. Employees will submit all needed reports on time and per procedures. Written/oral reports will be truthful and complete. Employees will not knowingly enter/cause to be entered any inaccurate, false, or improper information."

646 (11th Cir.1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.*, 121 F.3d at 646. Once the moving party has established the absence of a genuine issue of material fact to which the nonmoving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party. *Anderson*, 477 U.S. at 247–51, 106 S.Ct. at 2510–11. In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* 477 U.S. at 255, 106 S.Ct. at 2513.

### III. Count I—Dressler's Liberty Interest Claim

Count I of Dressler's complaint alleges a violation of his 14th Amendment right to procedural due process in that Dressler was "stigmatiz[ed] ... as being a liar" and was deprived of his "liberty interest in his own good name, i.e., Cochran damaged seriously Dressler's standing and associations in the community and foreclosed Dressler's freedom to take advantage of other employment opportunities." Complaint at ¶ 23–26. The court first notes that it could not find any evidence in the record to support Dressler's allegation that he has been foreclosed from taking advantage of other employment opportunities. Dressler does not argue that his termination as a reserve deputy had any effect at all on his primary employment as an Assistant State Attorney, and there is no evidence in the record to support a conclusion that Dressler was adversely affected in any way in his job with the State Attorney's Office. Similarly, Dressler has failed to show that he desired to take advantage of other employment opportunities as a reserve deputy, let alone that he was foreclosed from such opportunities. Because, as Dressler's counsel states, the reserve deputy position was more of a community service, it does not appear to be a great loss of liberty to him to be foreclosed from that job.

Moreover, Dressler has not shown in the record where there is evidence that he has been foreclosed from employment in other similar reserve deputy positions with other counties or municipalities. Nevertheless, the court in *Buxton v. City of Plant City, Florida*, 871 F.2d 1037, 1045 (11th Cir.1989) seemed to operate on the presumption that the mere publication of the stigmatizing information automatically foreclosed Buxton from employment opportunities. This court will therefore assume for purposes of summary judgment that Dressler has been foreclosed from other job opportunities as a reserve deputy. However, it does appear that Buxton offered evidence to the trial court of being foreclosed from "several employment opportunities". *See id.*, and Dressler has not offered such evidence.

In any event, the point is that in light of the fact that Dressler's reserve deputy position was not Dressler's primary full-time employment and the fact that the record is devoid of any evidence that Dressler has been foreclosed from (or even applied for) other employment opportunities, Dressler's liberty interest, if it exists at all, is minimal. *See, e.g., Versarge v. Township of Clinton, New Jersey*, 984 F.2d 1359, 1371 (3d Cir.1993) ("Courts that have addressed the constitutional requirements for a protected interest in reputation in a volunteer context have refused to find such a protected interest where the plaintiff has failed to show lost opportunity for employment."); *Jungels v. Pierce*, 825 F.2d 1127, 1131 (7th Cir.1987) (Deprivation of liberty in violation of due process "does not reach a case where the employee is fired from a part-time, honorific job while

retaining the employment that gives him his livelihood. Maybe Jungels will find it impossible in the future to obtain an appointment as a part-time city commissioner, but, if so, we cannot believe that such a minor deprivation would be a deprivation of occupational liberty."); *Kennedy v. McCarty,* 778 F.Supp. 1465, 1477–78 (S.D.Ind.1991) (finding that part-time reserve police officer failed to establish deprivation of a liberty interest by termination where he did not show that the termination affected his primary means of employment); *Shands v. City of Kennett,* 789 F.Supp. 989, 995 (E.D.Mo.1992) (finding that no liberty interest is implicated in the context of volunteer fire department where plaintiffs failed to establish that their terminations caused them "economic damage or lost ... opportunity for employment."). Nevertheless, even assuming that Dressler has a minimal liberty interest, it was not violated because he was given all the process due to him.

### A. The Legal Standard for a Deprivation of a Liberty Interest

In cases where a liberty interest arising from reputational damage is implicated, the courts have followed a procedural course different from a deprivation of a property interest in a job or benefit. The hearings granted in such cases serve not to avert the unjustified denial of a specific benefit, but to allow the aggrieved party to "clear his name." *Codd v. Velger,* 429 U.S. at 627, 97 S.Ct. at 884; *Campbell v. Pierce County, Georgia,* 741 F.2d 1342, 1345 (11th Cir.1984). The Eleventh Circuit has declared the procedural requisites of a name clearing hearing. "Because it is provided simply to cleanse the reputation of the claimant, the hearing need not take place prior to his termination or to the publication of related information adverse to his interests." *Campbell v. Pierce County, Georgia,* at 1345; *see also Rodriguez de Quinonez v. Perez,* 596 F.2d 486 (1st Cir.) *cert. denied,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979) (pre-termination hearing

not required but post-termination hearing necessary in case involving liberty interest); *White v. Thomas,* 660 F.2d 680 (5th Cir.1981) *cert. denied* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982) (posttermination hearing proper remedy for employee deprived of liberty interest during termination); *In re Selcraig,* 705 F.2d 789 (5th Cir.1983) (state need only inform stigmatized employee that the opportunity to clear his name exists upon request; pretermination hearing is not a prerequisite to publication).

■ To establish a deprivation of a liberty interest without due process of law, a plaintiff must show: "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for [an] employee name clearing hearing." *Buxton v. City of Plant City,* 871 F.2d 1037, 1042–43 (11th Cir.1989). The court's inquiry for purposes of summary judgment will focus on element six, whether plaintiff was given the opportunity for a name clearing hearing.

### B. Dressler Was Given a Name-Clearing Hearing

Defendant moves for summary judgment only on the theory that plaintiff has failed to satisfy element six, stating "[w]hile it is doubtful that Plaintiff can establish elements 1 through 5, for the purposes of this motion for summary judgment, the Sheriff contends that there are no set of facts upon which Plaintiff can rely to establish the sixth element, that is, that Plaintiff was discharged without an opportunity to refute the charges." Def. SJ Mot. at 6. It is undisputed that Dressler had at least two chances to clear his name. The first opportunity came on March 20, 1996 when Dressler gave a sworn taped investigative statement to Lt. Sylvia Pechuls. *See* Def. SJ Mot. Exhibit

22 ["Admin. Statement"]. Prior to the hearing, Dressler was given a complaint control form outlining the charges against him. *See id.* at 1. During the hearing, Dressler was provided with a further explanation of the charges against him, including copies of the Policy and Procedure Manual sections he was alleged to have violated. *See id.* at 5. For most of the two hour and fifteen minute proceeding, Dressler responded to questions from Pechuls concerning his alleged misconduct. *See id.* At the end of the proceeding, Dressler was given an opportunity to add anything further to the record, and he declined. *See id.* at 70.

Dressler's second opportunity to clear his name came at the Predisciplinary Conference of August 15, 1996. Dressler was given an opportunity to review the entire 43 page OPC investigative file, including the OPC report, witness statements and other evidence obtained during the investigation. *See* Def. SJ Mot. Exhibit 34; Def. Statement of Facts at ¶ 35. The conference was rescheduled from July 18, 1996 to August 15, 1996 at Dressler's request for more time to review the file and prepare for the conference. *See* Def. SJ Mot. Exhibit 35. At the conference, the charges against Dressler were once again clarified and his attorney acknowledged that he understood the charges against Dressler. *See* Def. SJ Mot. Exhibit 36 at 3. At the conclusion of the conference, Dressler was again allowed to make a statement, and the following exchange took place between Dressler's attorney, Harris Lowenthal, and Charles Whitelock, representing the Sheriff:

> Whitelock: ... [T]he idea is for this conference is for an employee to have the opportunity to make any comments explanation that they want regarding any of the events that are outlined there.... The employee wants to come in and then offer any other explanation any other events. This is the opportunity to do so ....

> Lowenthal: I see.

> Whitelock: Something to say or he wants to put into the record now.

> Lowenthal: Charles, the first time you said it, I swear I understood it. Though I appreciate that we we've said all we have to say at this time.

> Whitelock: Okay so then just so I understand Mr. Dressler is not responding or providing ... any further explanation.

> Lowenthal: Through me that's all whatever I've said is his explanation.

> Whitelock: Well this is his opportunity I just you know so that there is not an allegation later that he didn't have an opportunity we are just saying that he's been availed that opportunity and is either waiving that opportunity or.

> Lowenthal: That's true he's been availed that opportunity.

*Id.* at 29–32.

It is apparent from this exchange that Dressler was given a chance to "clear his name" after having been confronted with the charges against him. The record shows that Dressler did not choose to add anything further and he acknowledged that "he's been availed" the opportunity to add to the record.

## C. A Pre–Termination Name Clearing Hearing is Sufficient Under *Buxton*

Dressler argues in opposition to summary judgment and in support for his own motion for partial summary judgment, that "Cochran gave Dressler no chance to clear his name." Pl. Response at 18. Dressler states that "[t]he only opportunities that Scott Dressler ever had to say that he was not guilty were secret sessions with first investigator Pechuls and then assistant inspector general Vrchota, sessions that it would have been illegal for him to discuss with anyone else. This is hardly the kind of public name-clearing hearing envisioned by *Buxton*." *Id.* at 18. From plaintiff's motions and responses it appeared that he

had only one problem with the name clearing process: that the name clearing hearings were not public. Dressler never argued that he had a lack of notice or a lack of an opportunity to say he was "not guilty," instead Dressler's problem is that the hearings were not public. Defendant replied however, that "[t]he investigative statement and Predisciplinary Conference were audio-taped and later transcribed. These audio-tapes and transcriptions are a matter of public record pursuant to Florida Statutes, Chapter 119." Def. Reply at 3 n. 1 [citations omitted]. Oral argument served to clarify plaintiff's position. At oral argument, plaintiff conceded that all the proceedings in this case, including all hearings involving Dressler, are part of the public record.[5] Instead, plaintiff argued for the first time that *Buxton* requires a post-termination name clearing hearing; Dressler's pre-termination name-clearing hearings were therefore inadequate. In order to leave no doubt about the court's decision, the court will first address plaintiff's now abandoned argument that Dressler's hearing was not public. The court will then turn to give consideration to Dressler's new argument that he should have been given a post-termination hearing.

### 1. Plaintiff's Name Clearing Hearings Were Part of the Public Record

As shown above, plaintiff has admitted that his name clearing hearings are part of the public record. Because plaintiff originally disputed this issue and thoroughly briefed this argument, the court addresses the argument in this section. Although plaintiff relies on *Buxton* to stand for the proposition that a public name-clearing hearing is required, *Buxton* specifically held that the mere "presence of stigmatizing information place into the public record by a state entity, pursuant to a state statute or otherwise, constitutes sufficient publication to implicate the liberty interest under the due process clause . . . ." *Buxton,* 871 F.2d at 1045–46. In *Buxton,* the state agency had not gone out of its way to publicize the events surrounding Buxton's discharge; instead, the agency had released Buxton's personnel records as it was required under Florida Statutes § 119 and § 112.533. *See id.* at 1039 n. 2. If merely including the stigmatizing statements in personnel documents available to the public without, for example, issuing a press release about them or reading them aloud in the town square, is sufficient to implicate plaintiff's liberty interest, then logically, including a transcript of plaintiff's name-clearing statements in the same public records should be sufficient to satisfy the same liberty interests.

■ One of the principal concerns in *Buxton* and in paragraphs 25 and 26 of plaintiff's complaint, is the extent to which including stigmatizing information surrounding the public employee's termination in the public record harms the employee's liberty interest in obtaining future employment. *See Buxton,* 871 F.2d at 1045 ("Because of stigmatizing material in Buxton's personnel file and the internal affairs report of the English incident, both a part of the public records pursuant to Fla. Stat. §§ 119.01 and 119.07, Buxton has been foreclosed from several employment opportunities. Buxton's rights to 'live and work where he will;' 'to pursue

---

5.

| THE COURT: | So the public record contains all matters that have appeared as part of that hearing process? |
|---|---|
| MR. SHULBY (Def): | Correct. It would include the audio tape and within a few days it would contain a transcription of the audio tape, and the same thing with the predisciplinary conference. The predisciplinary conference is taped and that makes its way into the file and it is a public record and it is sometime later transcribed. |
| THE COURT: | Is there a dispute on that. I didn't see it. |
| MR. AMLONG (Pl.): | No, Your Honor there is not. |

any livelihood or avocation;' and 'to engage in the common occupations of life' have been limited by placing his personnel file and the internal affairs report of the English incident into the public record."); Complaint at ¶ 25 ("Dressler's termination notice, as well as the records of the investigation, are public records. His termination and the reasons for it have been communicated to the Florida Department of Law Enforcement, where it became part of Dressler's file as a certified law enforcement officer."). Therefore, by making the transcripts of Dressler's name-clearing hearings as available to the public as are his other employment records, the government's duty to provide a public name-clearing hearing is discharged. As stated above, Dressler has conceded that the public record contains transcripts of all his hearings. Additionally, it does not matter if the transcripts of his hearing are released after he was terminated as an employee. *See Buxton*, 871 F.2d at 1046 (citing *Campbell v. Pierce County, Georgia*, 741 F.2d at 1345 ("Because it is provided simply to cleanse the reputation of the claimant, the hearing need not take place prior to his termination or to the publication of related information adverse to his interests.")). Accordingly, based on plaintiff's concessions at oral argument and Eleventh Circuit case law, plaintiff's name clearing hearings were public.

### 2. A Pre-termination Hearing is Sufficient Under *Buxton*

■ For the first time, plaintiff argued at oral argument that a pre-termination hearing is inadequate, and *Buxton* requires a post-termination name clearing hearing to cure a deprivation of liberty. Plaintiff focuses on language in *Buxton* which reads, "[w]e hold that a public employer is required to provide the opportunity for a post-termination name-clearing hearing when stigmatizing information is made part of the public records, or otherwise published." *Buxton*, 871 F.2d at

1046. Plaintiff argues that the holding of *Buxton* specifically requires a post-termination hearing—a pre-termination hearing is therefore insufficient. The court is not persuaded by plaintiff's interpretation of *Buxton*.

First, it is axiomatic that a pre-termination hearing affords greater due process protection than a post-termination hearing. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.' This principle requires 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment."); *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Second, the *Buxton* court acknowledges that because tenured employees, who have a greater property interest in their jobs, usually receive pre-termination hearings, the court's decision will only apply to probationary or at-will employees, who usually receive less due process protection. *Buxton*, 871 F.2d at 1045 n. 14 ("Because tenured employees will ordinarily receive pre-termination hearings, our ruling will usually affect only probationary and at-will employees."). *Buxton* therefore serves to protect employees who were given no pre-termination procedures or pre-termination opportunities to clear their names. Defendant stated at oral argument that they gave Dressler the same protections that an employee with a property interest would have gotten,[6] and the court agrees.

Finally, in *Harrison v. Wille*, 132 F.3d 679 (11th Cir.1998), a post-*Buxton* case, the Eleventh Circuit clarified that the process due for a name-clearing hearing is not as strict as the process due for a depriva-

---

6. Dressler has never argued that he had a property interest in his position with the defendant.

tion of a property interest, and therefore the same procedures used to contest a deprivation of a property interest are more than sufficient for a liberty interest. *Harrison,* 132 F.3d at 683 n. 9 ("Assuming Plaintiff had a protected liberty interest in this case, the only process due Plaintiff to protect his liberty interest was a 'name clearing hearing.' The hearing need not take place before termination or the publication of the damaging information. Plaintiff must have the opportunity 'to support his allegations by argument however brief, and, if need be, by proof, however informal.' *Because this opportunity is not as strict as the process required before one can be deprived of a property interest, due process was satisfied by the same opportunities provided for notice and hearing for the termination itself* ....") (emphasis added and citations omitted). The court's position is supported by other circuits that have found pre-termination hearings provide adequate and greater protection of liberty interest than post-termination proceedings. *See, e.g., Vanelli v. Reynolds School District,* 667 F.2d 773, 779 (9th Cir.1982) ("Given the premise that the property interest required a pre-termination hearing, the liberty interest easily could have been protected in the same proceeding."); *Coleman v. Reed,* 147 F.3d 751, 755 (8th Cir.1998) (liberty interest protected where the plaintiff received two pre-termination opportunities to clear her name).

The court finds that the defendant gave Dressler adequate notice of the charges against him and at least two opportunities to respond. When compared to his minimal liberty interest in the reserve deputy position that was not his livelihood and the lack of any evidence of impact on his employment opportunities, the pre-termination hearings defendant gave Dressler were extremely generous and offered him a high degree of due process protection. Accordingly, the court finds that Dressler's liberty interest was not violated because he had adequate name-clearing hearings.

**D. Even if the Process was "Tainted," Dressler's Liberty Interest was Protected**

Dressler also argues in his response and motion that because the process and investigation needed to be fair, and because "there is evidence from which reasonable jurors could conclude the [sic] Gill and Pechuls faked Kogod's polygraph results and that Kogod was not telling the truth," summary judgement should not be granted. Pl. Response at 19. This argument would make sense if Dressler were challenging the manner in which his job was taken away—his property interest—but Dressler is only claiming his liberty interest was taken. Because the purpose of the hearing was only to give him an opportunity to clear his name, it does not matter if the investigation leading up to the termination of his job was fair or if the members of the hearing panel were not impartial. *See Campbell,* 741 F.2d at 1346 ("As to appellant's charge that the composition of the tribunal rendered impartiality impossible, we agree with the district court that the nature of the hearing resolves this question. Because the purpose of the hearing was not to reevaluate appellant's termination but to allow her to clear her name, the fact that the tribunal was composed of members of the Board of Commissioners did not impair its ability to preside in an acceptably impartial manner.").

Accordingly, because the court finds that there are no material issue in dispute that Dressler was presented with adequate notice as well as an adequate opportunity to respond and clear his name as required in *Buxton,* defendant's motion for summary judgment as to Count I of plaintiff's complaint is granted and plaintiff's cross-motion for summary judgment as to Count I is denied. *See, e.g., Harrison v. Wille,* 132 F.3d 679 (11th Cir.1998) (Palm Beach County Sheriff's Office deputy was afforded sufficient notice and opportunity to respond to satisfy due process where the

office had similar procedures as in this case).

## IV. Count II—Dressler's First Amendment Retaliation Claim

### A. The Legal Standard for Retaliatory Discharge

■ The First Amendment protects government employees from some, but not all, restraints on their right of free expression. *See, e.g., United States v. National Treasury Employees Union*, 513 U.S. 454, 464, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995); *Pickering v. Board of Ed.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). The Eleventh Circuit examines First Amendment retaliatory discharge claims under the four part test announced in *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir.1989). *Tindal*, 32 F.3d at 1539; *Morgan*, 6 F.3d at 754. The *Bryson* test examines (1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct. *Bryson*, 888 F.2d at 1565–66.

The first two elements of the Bryson test are questions of law designed to determine whether the employee's speech is protected by the First Amendment. *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir.1995). The third and fourth elements of the *Bryson* test are questions of fact designed to determine whether a retaliatory motive was the legal cause of the challenged employment decision.[7] To get before the jury, a plaintiff has to present enough evidence for a reasonable jury to conclude that his protected speech was a "substantial" motivating factor in the decision to terminate him. Defendant could still avoid liability, however, by convincing the jury that the plaintiff would have been terminated in the absence of First Amendment protected activity. *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576; *Tindal*, 32 F.3d at 1540; *Bryson*, 888 F.2d at 1565. Nevertheless, if a plaintiff produced enough evidence for a reasonable jury to conclude that a retaliatory animus substantially motivated his termination, defendant could only rebut this showing by convincing the jury, not the court, that a legitimate reason justified the decision. *See Pullman–Standard*, 456 U.S. at 289–90, 102 S.Ct. at 1790–91 (holding that issues of discriminatory intent and actual motivation are questions of fact for the trier of fact); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1557 (11th Cir.1983) ("Once an [illegal] motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor."), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).

### B. Plaintiff's Speech Was Unprotected

■ The court turns to the first *Bryson* factor, whether plaintiff was engaging in protected speech. If plaintiff's statements are true, then it is likely he was engaging in protected speech. Dressler's speech concerns political matters and public corruption—matters that lie at the core of activity protected by the First Amendment. *See generally McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–48, 115 S.Ct. 1511, 1518–19, 131 L.Ed.2d 426 (1995) (explaining that speech on public

---

7. The court need not go any further in the analysis of the third and fourth elements because defendant "conced[ed] for purposes of summary judgment that Plaintiff was terminated, in a very literal sense, because of his "speech," that is, Plaintiff was terminated be-cause he presented false and misleading allegations to the Broward County State Attorney's Office and was evasive and untruthful in his statements to the Sheriff's Office." Def. Reply at 2–3.

issues "occupies the core of the protection afforded by the First Amendment"); *see also Connick*, 461 U.S. at 152, 103 S.Ct. at 1692–93 (cautioning that "a stronger showing [of government interests] may be necessary if the employee's speech more substantially involved matters of public concern"); *Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736 (holding that the public's interest in school funding and teachers' special knowledge of school spending make it "essential that [teachers] be able to speak out freely on such questions without fear of retaliatory dismissal").

█ The problem in this case is that if plaintiff was lying or being reckless about what he reported Kogod told him, then his speech is unprotected. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("There is no constitutional value in false statements of fact."). In his response brief, Dressler states that "there is a dispute [sic] issue of fact in the case at bar as to whether what Dressler passed on to his superiors was true, thereby precluding summary judgment on that issue." Response at 5–6. The key question is therefore does the fact that Dressler and Kogod present diametrically opposed accounts of what transpired and "who said what" automatically create a jury question precluding summary judgment? Dressler argues that a jury question is in fact presented. Pl. Response at 19. ("Who was telling the truth, Dressler or Kogod? That is for a jury to consider, based on a combination of its judgment of the respective candor of Dressler and Kogod and on the scientific evidence about the two polygraph examinations. How politically motivated was Dressler is also for the jury to decide."). On the other hand, Defendant argues that the court must defer to the BSO investigation because it was reasonably conducted. Def. Reply at 6. The court finds defendant is correct.

### 1. *Waters v. Churchill* Limits Review of BSO's Investigation

Defendant relies on *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) to stand for the proposition that "the employer's determinations as to 'what was said' (that is, 'who to believe') must be upheld so long as the decision-maker reached its conclusion about what was said in good faith, rather than as pretext." Def. Reply at 6. The *Waters* court states:

The problem with the Court of Appeals' approach—under which the facts to which the *Connick* test is applied are determined by the judicial factfinder—is that it would force the government employer to come to its factual conclusions through procedures that substantially mirror the evidentiary rules used in court. The government manager would have to ask not what conclusions she, as an experienced professional, can draw from the circumstances, but rather what conclusions a jury would later draw. If she relies on hearsay, or on what she knows about the accused employee's character, she must be aware that this evidence might not be usable in court. If she knows one party is, in her personal experience, more credible than another, she must realize that the jury will not share that personal experience. If she thinks the alleged offense is so egregious that it is proper to discipline the accused employee even though the evidence is ambiguous, she must consider that a jury might decide the other way.

*Waters*, 511 U.S. at 675–76, 114 S.Ct. 1878.

█ The *Waters* court suggests that reviewing courts need not give complete deference to the facts as the employer found them to be, instead the court must "look to the facts as the employer reasonably found them to be." *Id.* at 677, 114 S.Ct. 1878. For example, "[i]t may be unreasonable ... for the employer to come to a conclusion based on no evidence at all. Likewise, it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is available—if, for instance, an employee is accused of writing an improper letter to the editor, and instead of reading the letter, the employer decides what it said based on unreliable hearsay." *Id.* Recognizing that "there will often be situations in which reasonable employers would disagree

about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion," the *Waters* court states that "[o]nly procedures outside the range of what a reasonable manager would use may be condemned as unreasonable." *Id.* at 678, 114 S.Ct. 1878. Finally, when an employer resolves the "who said what" question, "[i]t is necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext." *Id.* at 677, 114 S.Ct. 1878.

Therefore, it appears that Dressler can survive summary judgment against him if he shows: 1) that the BSO's conclusions or the procedures used to come to those conclusions were unreasonable, or 2) that the BSO reached its conclusion about what was said in bad faith or it was pretextual.

### 2. The BSO's Procedures and Conclusions Were Reasonable

■ Turning to the first question, it appears that the BSO's procedures were reasonably followed and its conclusions were not unreasonable. The Sheriff, through the Office of Professional Compliance, appears to have undertaken a thorough investigation of the allegations brought against Dressler. The Sheriff assigned Lt. Pechuls, a senior investigator, to investigate the allegations. In the course of the investigation, about twenty-five sworn taped statements were taken from various witnesses and all relevant documents were secured and incorporated into the investigative file. Pechuls produced a 43 page investigative report detailing her findings. The report and investigative file were presented to the Professional Standards Committee, an employee citizen board responsible for reviewing such allegations of misconduct and recommending discipline. The PSC found cause as to each of the two charges brought against Plaintiff and recommended termination. *See* Def. Facts at ¶¶ 30–31.[8]

The Sheriff therefore had the following information at hand: 1) the diametrically opposed testimony of Deputy Kogod and Dressler; (*See id.* at ¶¶ 8–16); 2) the polygraph examination of Kogod indicating no signs of deception (*See id.* at ¶ 12); 3) Dressler's refusals to take a polygraph examination (*See id.* at ¶ 29, 36); 4) the testimony of Sgt. Bernard McCormes, corroborating the testimony of Kogod (*See id.* at ¶ 14); 5) the testimony of Sgt. William Robshaw, corroborating the testimony of Kogod (*See id.* at ¶ 13); 6) the findings of the Broward County State Attorney's Office that the there was no evidence of misconduct criminal or otherwise from the Sheriff (*See id.* at ¶ 26); 7) Dressler's contact with Chris Roberts, a candidate for Sheriff that Dressler was supporting; 8) Dressler's evasiveness during his sworn statement to the Office of Professional Compliance and during his Predisciplinary Conference and the internal inconsistencies in his testimony (*See id.* at ¶¶ 17–25); 9) the finding of cause against Dressler by the neutral PSC board and their recommendation for termination (*See id.* at ¶¶ 30, 31).

Plaintiff's strongest argument is that the final decision maker in this case was Sheriff Cochran, and this situation "taints" the procedures that were followed. Plaintiff conceded in oral argument that he was unable to find any cases supporting his argument. Plaintiff has not shown that a different final decision maker would have chosen not to follow the PSC board's recommendation for termination. Plaintiff also has not adduced evidence that could allow a reasonable person to conclude that Cochran had interfered with the investigation or that the Sheriff "rigged" the investigation against Dressler. In any event, the question is whether plaintiff's speech was truthful and therefore protected. Pechuls wrote the report finding inconsistencies in Dressler's statements and noting

---

**8.** Although Dressler "specifically denies material assertions of" ¶¶ 30–31 "to comply with the local rule" 7.5, Dressler does not show

how the statements in those paragraph are in dispute.

Kogod's lack of deception in the polygraph exam. Based in this report, the neutral PSC board found probable cause to sustain the charges against Dressler. Dressler argues that there are problems with the way the PSC board operated in Dressler's case, including his contention that no PSC board member remembers Dressler's case and there is no record of any votes taken at the meeting. Even if the court accepts plaintiff's representations as true, they are insufficient for this court to conclude that the procedures followed were unreasonable. The court therefore concludes that plaintiff has not shown how the procedures followed were outside the range of what a reasonable manager would use.

Plaintiff also has failed to show how the conclusions reached were unreasonable. Even though Dressler's account of the events conflicted with Kogod's account, Pechuls states that the basis of the allegations of untruthfulness against Dressler did not come from the conflicts in their testimony. Pechuls Depo. at 47. The allegations came from "the conflicts in the testimony that Mr. Dressler himself gave." *Id.* A review of the findings Pechuls included in the investigative report shows that conflicts did exist. *See* Report at 37–38. Even though Dressler disagrees with the conclusions and would prefer his version of the events believed, that does not mean that there was not adequate evidence in the record to support a finding against him. Dressler has failed to show that the conclusions reached were unreasonable.

### 3. Dressler Fails to Show Bad Faith or Pretext

Dressler has also not shown bad faith or pretext in the BSO's determination that

Kogod's version of what he said or did not say was more believable than Dressler's. Kogod did take a lie detector test which indicated no deception. *See* Report at 37. Dressler did not submit to a lie detector test while the investigation was pending. Additionally, Sgt. Robshaw indicated in his memo of February 20, 1996 (Def. SJ Mot. Exhibit 20) that Kogod told him that he told Dressler that while the Sheriff did have a personal interest in the case, the Sheriff did not ask that Steinfeldt's bond be reduced or the charges dropped to misdemeanor. It appears that the investigators made a credibility determination which does not appear to be unreasonable, unsupported by the evidence or in bad faith. Because Dressler has failed to show bad faith, pretext, or unreasonable procedures or conclusions from the defendant, defendant is unable to show that his speech was protected. Defendant therefore fails to establish the elements of the *Bryson* test. Accordingly, defendant's motion for summary judgment on Dressler's retaliatory discharge First Amendment claim (Count II) is granted.[9]

### V. Notice of Court Consideration for Summary Judgment of Dressler's Count III

 In count III, Dressler requests injunctive relief. Defendant did not move for summary judgment on count III, therefore, the court gives notice of its consideration of count III for summary judgment in ten days. District courts unquestionably possess the power to trigger summary judgment on their own initiative. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, however, district courts must temper their exercise of

---

**9.** The Supreme Court in *Waters* remanded because the plaintiff had produced enough evidence to create a material issue of disputed fact about the defendant's actual motivation in firing her. *Waters,* 511 U.S. at 681, 114 S.Ct. 1878. The court concluded that there was a question of fact as to which of plaintiff's statements formed the basis of defendant's decision to fire her. *Id.* In this case, it

is clear that the statements that formed the basis of Dressler's termination were his memorandum of February 13, 1996 and his inconsistent statements to the investigator. Therefore, because the court concludes that the statements for which Dressler was fired were not protect speech, summary judgment is appropriate.

that power by the need to ensure that the parties receive adequate notice that they must bring forward all of their evidence. *See id.* at 326, 106 S.Ct. 2548. The restrictions upon the ability of the district court to award summary judgment *sua sponte* emanate from Rule 56 of the Federal Rules of Civil Procedure. The rule provides that motions for summary judgment "shall be served at least 10 days before the time fixed for the hearing," and expressly allows nonmovants to "serve opposing affidavits" at any time prior to the day of the hearing. Fed.R.Civ.P. 56(c). The notice provisions retain their mandatory character even when the district court contemplates awarding summary judgment *sua sponte* against a party that itself had moved for summary judgment. *See Massey v. Congress Life Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir.1997). Accordingly, the court hereby gives the plaintiff notice and an opportunity to respond before the court grants summary judgment against him. Plaintiff shall have ten days from the date of this order to submit a response.

**WHEREFORE, IT IS ORDERED THAT:**

1) Defendant's motion for summary judgment (DE # 75) is GRANTED;

2) Plaintiff's motion for partial summary judgment on his due process claim (DE # 86) is DENIED;

3) Defendant's motion for oral argument on its motion for summary judgment (DE # 77) is GRANTED;

4) Pending motions DE # 's 91, 102, and 141 are now MOOT.

5) Plaintiff shall have ten days from the date of this order to respond to the court's *sua sponte* consideration of summary judgment on count III.